UNITED STATES DISTRICT COURT
EASTERN DISTICT OF LOUISIANA

**RATTLER TOOLS, INC.**                         CIVIL ACTION
**Plaintiff**

**VERSUS**
                                                No. 05-293 c/w 05-3777

**BILCO TOOLS, INC.  and**
**WILLIAM COYLE, individually,**                SECTION: "C"
**Defendants**

<u>**OPINION AND ORDER**</u>

**INTRODUCTION**

Before the Court is a suit by Rattler Tools, Inc. which alleges that Bilco Tools, Inc. and

William Coyle infringed on five Rattler patents for Retrieving Metal Objects from a Wellbore.

The suit also alleges violations of various state law claims involving unfair trade practices and

misappropriation of trade secrets. Bilco Tools, Inc. has counterclaimed, alleging invalidity

and non-infringement of the Rattler patents and its own claims against Rattler Tools, Inc. for

violations of state law involving unfair trade practices. For the reasons discussed herein, the

Court finds that Bilco Tools, Inc. and William Coyle, individually, have neither infringed on any

of the five Rattler patents nor violated Louisiana state laws as alleged. As a result, all of the

claims by Rattler Tools, Inc. against Bilco Tools, Inc. and Mr. Coyle, personally, are

DISMISSED.  Bilco Tools, Inc.'s counterclaim seeking a declaration of non-infringement is

GRANTED.  Bilco's counterclaim of invalidity of the patents was waived, and is DISMISSED.

Finally, the Court finds Bilco's state law claims unpersuasive and they are DISMISSED.

**BACKGROUND FACTS AND PROCEDURE**

On February 2, 2005, Rattler Tools, Inc. (Plaintiff) filed a complaint for declaratory

judgment against Bilco Tools, Inc. (Defendant), alleging that Defendant was infringing one

or more independent claims of Plaintiff's U.S. Patent Numbers 6,216,787 (the 787 patent);

6,308,781 (the 781 patent); 6,354,386 (the 386 patent); 6,357,539 (the 539 patent); and

6,494,117 (the 117 patent).[1]   On March 29, 2005, Defendant filed a counterclaim, seeking a

declaratory judgment of a defective title, invalidity, and non-infringement of the Rattler

patents. On November 21, 2005 the case was consolidated with *Rattler Tools, Inc. v. William E.*

*Coyle, Jr., et al*, case number 05-3777.[2]   On November 8, 2006, the parties signed a stipulated

agreement that Defendants would not "use or sell a wellbore magnetic retrieval tool through

the pendency of this litigation and this Court's final decision."[3]   On January 17, 2007, Plaintiff

filed an amended complaint,[4]   alleging violations of Louisiana law, including unfair trade

practices, unfair competition, misappropriation of trade secrets and unjust enrichment. Also on

January 17, 2007, Defendant filed an amended counterclaim,[5]   alleging that Rattler disseminated

incorrect and untruthful information concerning Bilco's Tough Boy tool to hurt Bilco's

reputation and disrupt Bilco's business practices. A motion to hold a Markman hearing was

denied in the interest of judicial efficiency, as this case did not involve a jury trial, the motion

was filed close to the time of the scheduled bench trial, and the parties had not identified which

terms or definitions were actually in controversy.[6]   The case proceeded to a bench trial, held

May on 15, 16, and 17, 2007, where evidence as to both alleged claim construction and

---

[1] Rec. Doc. 1.
[2] Rec. Doc. 23.
[3] Red. Doc. 85.
[4] Rec. Doc. 102 (modified in Rec. Doc. 109, on January 22, 2007, to edit text).
[5] Rec. Doc. 105
[6] Rec. Doc. 147.

infringement was heard. At the outset of the trial proceedings, the Court informed the parties

that all of the Defendants' motions in limine[7] and Plaintiff's motions in limine[8] would be taken

under submission, since virtually all of the objections went to the weight given to the testimony

and  not to its admissibility.


**JURISDICTION**

Jurisdiction in this case is based on the laws of the United States concerning actions

related to patents (28 U.S.C. 1331 and 1338).


**THE PATENTS IN DISPUTE**

The Court has only reproduced the text of the independent claims actually in dispute in

this matter. Where necessary for construing individual claims and limitations or infringement,

the Court will provide the text of any relevant dependent claims.


**US 6,216,787 B1, Patent Date: April 17, 2001, Filed: October 21, 1999.
One independent method claim in dispute.**

1. A method of retrieving metal particles from a well bore, comprising the
following steps:

providing a tool body having a central opening therein;

providing a plurality of magnet assemblies longitudinally spaced along said tool
body, each magnet assembly comprising a plurality of magnet members, said
magnet members coving a majority surface area of said tool body, exterior surfaces
of said magnet members defining metal particles settling area;

detachably non-rotatable securing each of said magnet members on said tool body;

lowering said body into the well bore and imparting rotation to said tool body,
thereby creating a magnetic field and causing metal particles to settle on said
magnet assemblies;

providing a magnet protector for each of said magnet members for deflecting a
striking force of said metal particles on said magnet members; and

---

[7] Rec. Doc. 176, 178 and 184.
[8] Rec. Doc. 177, 179 and 185.

forming one side of each of said magnet protectors with a length greater than a corresponding side of the immediately adjacent magnet member to thereby protect the immediately adjacent magnet member from striking force of metal particles being attracted by the magnet member.

**US 6,308,781 B2, Patent Date: October 30, 2001, Filed: February 21, 2001. One independent method claim in dispute.**

1. A method of retrieving metal particles from a well bore, comprising the following steps:

providing a tool body having a central opening therein;

providing a plurality of magnet assemblies longitudinally spaced along said tool body, each magnet assembly comprising a plurality of magnet members, said magnet members covering a majority surface area of said tool body, exterior surfaces of said magnet members defining a primary metal particles settling area;

detachably non-rotatably securing each of said magnet members on said tool body;

providing a magnet protector for each of said magnet members and forming a trap space between each of said magnet members and a magnet protector of an immediately adjacent magnet member, thereby creating a secondary metal particles settling area;

lowering said body into the well bore and imparting rotation to said tool body, thereby creating a magnetic field and causing metal particles to settle on said magnet assemblies.

**US 6, 354,386 B1, Patent Date: March 12, 2002, Filed: June 22, 2000. Two independent apparatus claims in dispute.**

1. An apparatus for retrieving metal objects from a wellbore, comprising:

a cylindrical tool body with a central opening there-through;

a plurality of magnet assemblies spaced longitudinally along the length of the tool body and covering a majority of surface areas of said tool body, each of said magnet assemblies comprising a plurality of elongated magnet members spaced equidistantly from each other about the circumference of said tool body, each of said magnet members being provided with a magnet protector that extends outwardly from an exterior of said tool body to a distance greater than a corresponding magnet member to protect the corresponding magnet member from striking force of metal particles being attracted by the magnet member, while retaining a distance between the magnet protector and an adjacent magnet member.

10. An apparatus for retrieving metal objects from a wellbore, comprising:

a cylindrical tool body with a central opening there-through;

a plurality of magnet assemblies spaced longitudinally along the length of the tool body and covering a majority of surface area of said tool body, each of said magnet assemblies comprising a plurality of elongated magnet members spaced equidistantly from each other about the circumference of said tool body, each of said magnet members being provided with a magnet protector, one side of each of said magnet protectors and a side of an immediately adjacent magnet member defining a metal particles trap space.

**US 6,357, 539 B1, Patent Date: March 19, 2002, Filed: June 22, 2000.**
**Two independent apparatus claims in dispute.**

1. An apparatus for retrieving metal objects from a wellbore, comprising:

a cylindrical tool body with a central opening there-through;

a plurality of magnet assemblies spaced longitudinally along the length of the tool body and covering a majority of surface area of said tool body, each of said magnet assemblies comprising a plurality of elongated magnet members, an exterior surface of each of said magnet members forming a settling surface for the metal objects being attracted by the magnet member, each of said magnet assemblies comprising a pair of magnet members detachably secured on said tool body, each of said magnet members having an arcuate cross section.

4. An apparatus for retrieving metal objects from a wellbore, comprising:

a cylindrical tool body with a central opening there-through;

a plurality of magnet assemblies spaced longitudinally along the length of the tool body and covering a majority of surface area of said tool body, each of said magnet assemblies comprising a plurality of magnet members detachably secured on said tool body, each of said magnet members having an arcuate cross section, an exterior surface of each of said magnet members forming a settling surface for the metal objects being attracted by the magnet members.

**US 6,491,117 B2, Patent Date: December 10, 2002, Filed: April 5, 2001.**
**Three independent apparatus claims/one independent method claim in dispute.**

1. An apparatus for retrieving metal debris from a wellbore, comprising:

a cylindrical tool body with a central opening there-through;

a plurality of sets of magnet assemblies spaced longitudinally along the length of the tool body, each set comprising a plurality of magnet assemblies spaced

circumferentially about the outer circumference of the tool body, said magnet assemblies each having an exterior surface defining primary debris settling area, each of said sets of magnet assemblies comprising an elongated magnet member spaced longitudinally from a magnet member of another set of magnet assemblies secured on the tool body in a non-coaxial relationship to each other, each of said magnet assemblies comprising a magnet liner, each magnet liner being secured within a recess formed in said tool body, and wherein each of said magnet members is fitted in said magnet liner;

a magnet protector formed immediately adjacent to each of the magnet assemblies and extending outwardly from said tool body; and

a plurality of secondary debris settling areas, each secondary debris settling area being defined by the tool body in locations between a magnet assembly and a magnet protector of an adjacent magnet assembly.


8. An apparatus for retrieving metal debris from a wellbore, comprising: a cylindrical tool body with a central opening therethrough;

a plurality of sets of magnet assemblies spaced longitudinally along the length of the tool body in a coaxial relationship to each other, each set comprising a plurality of magnet assemblies spaced circumferentially about the outer circumference of the tool body, each of said magnet assemblies comprising a magnet member detachably secured on said tool body, each of said magnet members having an exterior surface defining a primary debris settling area;

a magnet protector formed immediately adjacent [sic] each of the magnet assemblies and extending outwardly from said tool body; and

a plurality of secondary debris settling areas, each secondary debris settling area being defined by the tool body in locations between a magnet assembly and a magnet protector of an adjacent magnet member, each secondary debris settling area having a [sic] least half as much surface area as the immediately adjacent primary settling area.


12. An apparatus for retrieving metal objects from a wellbore, comprising:

a cylindrical tool body with a central opening therethrough and a plurality of recesses formed on said tool body;

a plurality of sets of magnet assemblies space longitudinally along the length of the tool body in a coaxial parallel relationship to each other, each set comprising a plurality of magnet assemblies spaced circumferentially about the outer circumference of the tool body, each of said magnet assemblies comprising of an [sic] L-shaped magnet liner, each magnet liner being fitted in a corresponding recess of the tool body and a magnet member, each magnet member placed in a

corresponding magnet liner, said each of said [sic] magnet members defining a primary debris settling area;

a magnet protector formed by the tool body immediately adjacent each [sic] of the magnet assemblies; and

a plurality of secondary debris settling areas, each secondary debris settling area being defined by the tool body in locations between a magnet assembly and a magnet protector of an adjacent magnet member, each secondary debris settling area having at least half as much surface area as the immediately adjacent primary settling area.


14. A method of retrieving metal particle from a well bore, comprising the following steps:

providing a tool body having a central opening therein;

providing a plurality of magnet assemblies longitudinally spaced along said tool body, said magnet assemblies defining a primary settling area, each of said magnet assemblies comprising a magnet liner, each magnet liner being secured within a recess formed in said tool body, and wherein each of said magnet members is fitted in said magnet liner;

providing a magnet protector for each of said magnet assemblies for deflecting a striking force of said metal particles on said magnet assemblies;

forming secondary particles settling area on said tool body for attracting the particles by a residual magnetic force created by the magnet assemblies, said secondary particles settling area being defined by the tool body in locations between a magnet assembly and a magnet protector of an adjacent magnet assembly, said secondary particles settling area having at least half as much surface area as the primary settling area;

lowering said body into the well bore and imparting rotation to said tool body, thereby creating a magnetic field and causing metal particles to settle on said primary and said secondary particles settling areas.

7

## THE APPLICABLE LAW

A United States patent enjoys a presumption of validity.[9]  Validity of a current patent endures until a challenger carries its burden of persuading a court that the patent can no longer be accepted as valid.[10]  That burden requires proof by clear and convincing evidence.[11]  Where a defendant cannot meet that burden, the court need only so state; it is not required to validate the patent that is the subject of the suit.[12]

"The limits of a patent must be known for the protection of the patentee, the encouragement of the inventive genius of others and the assurance that the subject of the patent will be dedicated ultimately to the public."[13]   This is to prevent a "zone of uncertainty which… would discourage invention."[14]

Whether a patent has been infringed is determined through a two-step analysis.[15] First, the claims of the patent at issue must be construed to determine their meaning and scope; second, the claims must be compared to the allegedly infringing device.[16]

Claim construction is a question of law to be decided by the Court.[17]  To properly construe a claim, the Court looks first at the intrinsic evidence of the patent record, which includes the claim language itself, the specification, and the relevant prosecution history.[18] A patentee is held to the claim construction that was argued during the patent prosecution,

---

[9] 35 U.S.C. § 282.
[10] *Monsanto Co. v. Scruggs*, 342 F.Supp.2d 584, 600 (N.D.Miss. 2004), citing *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1534 (Fed. Cir. 1983).
[11] *Id.*, citing *Loctite Corp. v. Ultraseal Ltd.*, 781 F.2d 861, 872 (Fed. Cir. 1985).
[12] *Monsanto Co. v. Scruggs*, 342 F.Supp.2d 584, 600 (N.D.Miss. 2004).
[13] *General Elec. Co. v. Wabash Appliance Corp.*, 304 U.S. 364, 369 (1938).
[14] *United Carbon Co. v. Binney & Smith Co.*, 317 U.S. 228, 236 (1942).
[15] *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc), aff'd, 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996). "A patent covers the invention or inventions which the court, in construing its provisions, decides that it describes and claims."
[16] *Id.*
[17] *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 977 (Fed. Cir. 1995) (en banc), aff'd, 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996).
[18] *Alza Corporation, et al v. Mylan Laboratories, Inc., et al*, 391 F.3d 1365 (Fed. Cir. 2004). See also *Phillips v. AWH Corp (Phillips II),* 415 F.3d 1303 (Fed. Cir. 2005) en banc, cert. denied, 126 S.Ct. 1332 (2006).

in order to preserve the public's reliance on the public records.[19]  Intrinsic evidence "is the most significant source of the legally operative meaning of disputed claim language."[20]  Extrinsic evidence, such as technical manuals and drawings, dictionaries, expert testimony, and the testimony of the inventor, may be used to enhance the Court's understanding of the technology involved in the patent and the allegedly infringing device.[21]  However, this extrinsic evidence may not be used to contradict or alter the intrinsic evidence.[22]

Claims are construed from the perspective of a person of ordinary skill in the field of the invention.[23]  Generally, both technical terms and common language contained in a patent claim will be interpreted as having the meaning that a person "experienced in the field of the invention" would understand it to have.[24]  Further, "the ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application."[25]  "[T]he person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification."[26]

---

[19] *Springs Window Fashions LP v. Novo Industries., LP*, 323 F.3d 989, 995 (Fed Cir. 2003).

[20] *Vitronics Corp. v. Concepronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).

[21] *EMI Group N. Am., Inc. v. Intel Corp.*, 157 F.3d 887, 892 (Fed. Cir. 1998).

[22] *Mantech Envtl. Corp., v. Hudson Envtl. Servs., Inc.*, 152 F.3d 1368, 1373 (Fed. Cir. 1998).

[23] *Phillips v. AWH Corp. (Phillips II)*, 415 F.3d 1303, 1312-1313 (Fed. Cir. 2005). See also *Innova*, 381 F.3d at 1116 ('A court construing a patent claim seeks to accord a claim the meaning it would have to a person of ordinary skill in the art at the time of the invention.'); *Home Diagnostics, Inc. v. LifeScan, Inc.*, 381 F.3d 1352, 1358 (Fed. Cir. 2004) ('customary meaning' refers to the 'customary meaning in [the] art field'); *Ferguson Beauregard/Logic Controls v. Mega Sys., LLC*, 350 F.3d 1327, 1338 (Fed. Cir. 2003) (claim terms 'are examined through the viewing glass of a person skilled in the art'); see also *PC Connector Solutions LLC v. SmartDisk Corp.*, 406 F.3d 1359, 1363 (Fed. Cir. 2005) (meaning of claim 'must be interpreted as of [the] effective filing date' of the patent application); *Schering Corp. v. Amgen Inc.*, 222 F.3d 1347, 1353 (Fed. Cir. 2000) (same)."

[24] *Hoechst Celanese Corp. v. B.P. Chems. Ltd.*, 78 F.3d 1575, 1578 (Fed. Cir. 1996).  The Court notes that the Federal Circuit has held that "the words of a claim 'are generally given their ordinary and customary meaning.' The ordinary and customary meaning is one that would be understood as such by 'a person of ordinary skill in the art in question at the time of the invention.' *Sky Technologies, LLC v. Ariba, Inc.* 2007 WL 1705641, 1 (D.Mass.) (D.Mass. 2007), internal citations omitted."

[25] *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed.Cir.2005) (en banc) (citations omitted).

[26] *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed.Cir.2005) (en banc) (citations omitted).

35 U.S.C. § 112 requires that a patent "shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains ... to make and use the same."[27]  "The specification contains a written description of the invention that must enable one of ordinary skill in the art to make and use the invention. For claim construction purposes, the description may act as a sort of dictionary, which explains the invention and may define terms used in the claims."[28]   The Federal Circuit has held that "the specification is 'the single best guide to the meaning of a disputed term.'"[29]  "The close kinship between the written description and the claims is enforced by the statutory requirement that the specification describe the claimed invention in 'full, clear, concise, and exact terms.'"[30]

"In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words."[31]

"Under the doctrine of claim differentiation, a dependent claim and a corresponding independent claim should not be construed to have the same scope; the dependent claim should have an additional limitation."[32]   "The doctrine precludes interpretations of claim language that render dependent claims too broad or independent claims too narrow, but it should not be used to interpret an independent claim too broadly either."[33]

---

[27] 35 U.S.C. § 112; see also *Phillips v. AWH Corp*, 415 F.3d 1303, 1311 (Fed. Cir. 2005).
[28] *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed.Cir.1995) (en banc), aff'd, *Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996) (citation omitted).
[29] *Phillips v. AWH Corp*, 415 F.3d 1303, 1314 (Fed. Cir. 2005).
[30] *Id*. at 1311, quoting 35 U.S.C. § 112.
[31] *Phillips v. AWH Corp*, 415 F.3d 1303, 1314  (Fed. Cir. 2005), citing *Brown v. 3M*, 265 F.3d 1349, 1352 (Fed. Cir. 2001).
[32] *Lasermax, Inc. v. Glatter*  2005 WL 1981571, 4 (S.D.N.Y.) (S.D.N.Y. 2005).
[33] *Lasermax, Inc. v. Glatter*  2005 WL 1981571, 4 (S.D.N.Y.) (S.D.N.Y. 2005), citing *Tandon Corp. v. U.S. Int'l Trade Comm'n*, 831 F.2d 1017, (Fed.Cir.1987): "Whether or not claims differ from each other, one can not interpret a claim to be broader than what is contained in the specification and claims as filed."

Courts should also investigate the prosecution history, as it may "often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be."[34] A patent's prosecution history may include that of related patents.[35] "Because [the] patents all derive from the same parent application and share many common terms, we must interpret the claims consistently across all asserted patents."[36]

"[A] claim is construed without regard to the accused product."[37] It is only after the elements of the claims are properly construed that the allegedly infringing device is considered.

Infringement of a claim by the accused device is a question of fact to be decided by the finder of fact, and a "patent is infringed if a single claim is infringed."[38] However, a finding of infringement requires that every limitation of a claim be met, either literally or by a substantial equivalent.[39] An accused device infringes a claim literally only when that device embodies every limitation of that claim.[40] Literal infringement occurs when every element of a patent claim is met "exactly" in the accused device or process.[41] If every element is not met exactly, there is no literal infringement, however the doctrine of equivalents may allow that an element is met if it performs substantially the same function in substantially the same way to achieve substantially the same result as the claimed element.[42]

---

[34] *Phillips v. AWH Corp.*, 415 F.3d 1303, 1317 (Fed. Cir. 2005) (en banc) (citations omitted).
[35] *NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282, (Fed. Cir. 2005), cert. denied, 126 S.Ct. 1174 (2006).
[36] *Id.* at 1293, citing *Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1350 (Fed. Cir. 2004).
[37] *Jurgens v. McKasy*, 927 F.2d 1552, 1560 (Fed. Cir. 1991).
[38] *Intervet America, Inc. v. Kee-Vet Lab. Inc.*, 887 F.2d 1050, 1055 (Fed. Cir. 1989).
[39] *Monsanto Co. v. Scruggs*, 342 F.Supp.2d 584, 591 (N.D.Miss. 2004), citing *Intellicall, Inc. v. Phonometrics, Inc.*, 952 F.2d 1384, 89 (Fed. Cir. 1992).
[40] *Warner-Jenkinson Co., Inc. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 29, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997); *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1323 (Fed. Cir. 2002).
[41] *Leviton Mfg. Co., Inc. v. Universal Sec. Instruments, Inc.*, 409 F.Supp.2d 643, 658 (D.Md. 2006), citing *Southwall Technologies, Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1575 (Fed. Cir. 1995).
[42] *Aquatex Indus., Inc. v. Techniche Solutions*, 419 F.3d 1374, 1382 (Fed. Cir. 2005).

A patentee bears the burden of proving infringement by a preponderance of the evidence.[43] Parties to a patent infringement suit generally present expert testimony in support of their positions.[44] The proper focus of expert testimony is technical, rather than legal.[45] The Federal Circuit has stated that "this court has on numerous occasions noted the impropriety of patent lawyers testifying as expert witnesses and giving their opinion regarding the proper interpretation of a claim as a matter of law, the ultimate issue for the court to decide."[46]

Willfulness in a patent infringement case is demonstrated where, looking at the "totality of circumstances, clear and convincing evidence establishes that the infringer acted in disregard of the patent, that the infringer had no reasonable basis for believing it had a right to engage in the infringing acts."[47]

A determination of whether a corporate officer is personally liable for direct infringement by a corporation "requires invocation of those general principles relating to piercing the corporate veil."[48] If an officer engages in patent infringement while acting within the scope of his employment, his actions are generally protected by the corporate veil, unless there is evidence justifying piercing the corporate veil.[49] Personal liability "for inducement to infringe is not automatic but must be supported by personal culpability."[50] To hold a corporate

---

[43] *Centricut, LLC v. Esab Group, Inc*., 390 F.3d 1361, 1367 (Fed. Cir. 2004).

[44] *Canon Computer Systems, Inc. v. Nu-Kote Int'l., Inc*., 134 F.3d 1085, 45 USPQ2d 1355 (Fed. Cir. 1998).

[45] *Moore v. Wesbar Corp*., 701 F.2d 1247, 217 USPQ 684 (7th Cir. 1983).

[46] Endress + Houser, Inc. v. Hawk Measurement Systems Pty. Ltd., 122 F.3d 1040, 1042, 43 USPQ2d 1849, 1852 (Fed. Cir. 1997).

[47] *Electro Med. Sys., S.A. v. Cooper Life Sciences,* Inc., 34 F.3d 1048, 1056 (Fed. Cir. 1994); *State Indus., Inc. v. Mor-Flo Indus., Inc*., 883 F.2d 1573, 1581 (Fed. Cir. 1989).

[48] *Orthokinetics Inc. v. Safety Travel Chairs Inc*., 806 F.2d 1565, 1579 1 U.S.P.Q. 2d 1081, 1090 (Fed. Cir. 1986). See also *Manville Sales Corp. v. Paramount Systems, Inc*., 917 F.2d 544, 16 U.S.P.Q. 1587 (Fed. Cir. 1990): "to be personally liable for infringement… there must be evidence to justify piercing the corporate veil."

[49] *Hoover Group, Inc. v. Custom Metalcraft, Inc*., 84 F.3d 1408, 1411-1412 (Fed. Cir. 1996; see also *Al-Site Corp. v. VSI Int'l., Inc*., 174 F.3d 1308, 1331 (Fed. Cir. 1999).

[50] *Id*. at 1412.

officer liable for inducing infringement, the plaintiff must establish that the officer "knowingly induced infringement," meaning he "possessed specific intent to 'aid and abet' infringement."[51]

Should the plaintiff prevail in an infringement action, "the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court."[52]  To recover lost profits the plaintiff must show "that the infringer actually caused the economic harm for which the patentee seeks compensation."[53] If a plaintiff cannot prove it is entitled to lost profits, then the plaintiff is entitled to a reasonable royalty for the use of the invention.[54]

Congress has granted district courts authority to award attorney fees in patent infringement cases.[55]  "The determination of an award of attorney fees pursuant to 35 U.S.C. § 285 is actually a two-step inquiry: first, the trial court must determine whether the case is exceptional; and if it is, then it is within the court's discretion to award attorney fees to the prevailing party."[56]  "Types of conduct that might support a showing of exceptional circumstances include willful infringement, inequitable conduct before the Patent and Trademark Office, litigation misconduct, and vexatious or unjustified litigation or frivolous suit.[57]  The court will find a case exceptional under 35 U.S.C. § 285 only when the party seeking the award of attorney fees produces sufficient evidence of bad faith.[58]  That party must prove bad faith by clear and convincing evidence.[59]

---

[51] *Id.*
[52] 35 U.S.C.A. § 284.
[53] *Minco, Inc. v. Combustion Eng'g., Inc.*, 95 F.3d 1109, 1118 (Fed. Cir. 1996).
[54] *Riles v. Shell Exploration  & Prod. Co.*, 298 F.3d 1302, 1311 (Fed. Cir. 2002).
[55] *Century Wrecker Corp. v. E.R. Buske Mfg. Co., Inc.*, 913 F.Supp. 1256, 1292 (N.D. Iowa 1996).
[56] *Id.*
[57] *Century Wrecker Corp. v. E.R. Buske Mfg. Co., Inc.*, 913 F.Supp. 1256, 1292 (N.D. Iowa 1996), citations omitted.
[58] *Reactive Metals and Alloys Co. v. ESM*, 769 F.2d 1578, 1582 (Fed.Cir. 1985).
[59] *Id.*, citing *Hycor Corp. v. Schlueter Co.*, 740 F.2d 1529, 1538 (Fed.Cir. 1984).

**PART ONE: CONSTRUCTION OF THE RATTLER PATENT CLAIMS AS A MATTER OF LAW**

In conformity with *Markman,* the Court addresses the first requirement of the two-part inquiry: construing the claims of the Rattler patents from the perspective of a person of ordinary skill in the field of the invention.[60]

In construing the meaning and scope of the claims of the Rattler patents allegedly infringed upon in this suit, the Court used the following intrinsic evidence: the language of the claims, the specifications, and the prosecution history in specific instances where it was relevant.[61]  In addition, the Court used the following extrinsic evidence for the purpose of educating the Court: testimony of David J. Ruttley, inventor of the MagTrap, said testimony providing Rattler's explanation of infringement by a person skilled in the field of the invention; testimony and the expert report of Michael Carbo, a patent attorney, not skilled in the field of the invention, said testimony used only to clarify Rattler's claims of infringement; testimony and the expert report of Lubbert Westra, Bilco's technical expert, said testimony providing Bilco's defense against infringement by a person skilled in  the field of the invention; and, where necessary for further clarification or support, the Oxford English Dictionary, second edition, (OED). While the Court used both intrinsic and extrinsic evidence in its consideration, they were not given equal weight. In accordance with the Federal Circuit's holding in *Phillips II*,[62]  the Court gave primary consideration to the meaning of any disputed terms in the context of their usage in the claim limitations and specifications — and rarely, from the prosecution

---

[60] *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc).

[61] "Claim construction is but a preliminary step in adjudicating a patent infringement claim. See *Cybor Corp.*, 138 F.3d at 1454. The court's role at this preliminary stage is solely to define disputed claim terms. See *Southwall Techs., Inc.*, 54 F.3d at 1578. Prosecution history may assist at this stage by illuminating a special or different meaning used by an inventor for a disputed term. *Vitronics, Corp.*, 90 F.3d at 1582. In *Southwall Technologies, Inc.*, the Federal Circuit also noted that prosecution history "limits the interpretation of claim terms so as to exclude any interpretation that was disclaimed during prosecution." 54 F.3d at 1576." *Sky Technologies, LLC v. Ariba, Inc.*  2007 WL 1705641, 2 (D.Mass.) (D.Mass. 2007).

[62] *Phillips v. AWH Corp (Phillips II)*, 415 F.3d 1303 (Fed. Cir. 2005) en banc, cert. denied, 126 S.Ct. 1332 (2006).

history[63] — while viewing the patent as a whole, and from the perspective of a person of ordinary skill in the field of the invention, at the time of the invention.

Certain disputed terms and phrases in the five patents must first be given their meanings as understood by a person of ordinary skill in the field of the invention. Those disputed terms and phrases are defined as follows. The definitions will then be incorporated into the construction of the claim elements of the five patents at issue in this case, which will later be used during the infringement analysis. Since there are multiple patents as well as multiple claims, for the sake of clarity the Court exercises its discretion to interpret the disputed terms and phrases, to construe the claim elements, and then to perform infringement analysis on each of the claims separately. Further, the Court notes that since the five Rattler patents share many common terms, it will interpret the claims consistently across all the asserted patents.

**MEANING OF THE DISPUTED TERMS**

**1. "[C]overing a majority surface area of said tool body"**

This phrase is contained in independent claims of the 787 patent,[64] the 781 patent,[65] the 386 patent,[66] and the 539 patent.[67]  The 787 and 781 patents claim magnet members covering a majority surface area of the tool body; the 386 and 539 patents claim magnet assemblies covering a majority surface area of the tool body. As to this phrase, the Court construes the following meaning: "covering a majority surface area of said tool body" means the actual, physical magnet (or assembly) takes up more than half of the exterior of the tool body. To put

---

[63] *Id.* The Court notes that *Phillips II* found that the prosecution history, since it is part of the negotiation of the patent and not the patent itself, is less useful than the specification in claim construction.
[64] Col. 6, line 14-15.
[65] Col. 6, line17-18.
[66] Col. 5, line 62-63, col. 6, line 49-52.
[67] Col. 6, line 8-9.

it another way, at least half of the outer surface area of the tool body contains the physical magnetic material itself rather than the undefined magnetic field created by the magnets.

All four patent Abstracts, whether method or apparatus claims, contain explicit language declaring that the device contains "a plurality of magnet members… covering a majority surface area of the tool body."[68] All four summaries of the invention contain explicit language that the device contains "a plurality of magnets encircling the body of the tool and covering a surface area greater than one half of the tool body."[69] All four patents contain drawings that illustrate that more than half the tool body visibly contains magnets. The language is explicit that it is the surface area of the tool itself that is covered by magnets (or assemblies).

The Court is not persuaded that the phrase can be expanded to include the area subjected to any magnetic field created by the magnets, as argued by Plaintiff. References in the specifications of the four patents to the magnets providing 360-degree "coverage" explicitly refer to what happens when the tool is rotated, and the magnetic field thus created, but not to the physical layout of the magnet on the tool itself.[70]  Plaintiff's argument that the phrase should be interpreted in a parallel manner to a spotlight or water sprinkler covering a yard is also unconvincing. A spotlight, when operated, provides an area with illumination coverage, and a water sprinkler, when operated, provides a lawn with water coverage. This phrase cannot be stretched to say that the spotlight or the water sprinkler itself covers a majority of the *surface* area of the yard.

While comparison of an accused device to a patent is not relevant to claim construction, the Court notes that it is also not persuaded by Plaintiff's argument that "[m]ore than one-half of

---

[68] 787 patent Abstract, page 1; 781 patent Abstract, page 1; 386 patent Abstract, page 1; 539 patent Abstract, page 1.
[69] 787 patent, col. 1, line 58-60; 781 patent, col. 1, line 67 through col. 2, line 2; 386 patent, col. 1, line 67 through col. 2, line 2; 539 patent, col. 1, line 67 through col. 2, line 2.
[70] 787 patent, col. 4, line 2-4; 781 patent, col. 4, line 12-14; 386 patent, col. 4, line 12-14; 539 patent, col. 4, line 12-14.

the longitudinal length of the Bilco tool is occupied by magnets, and the magnets are arranged to provide 360-degree coverage, that is, coverage over the blue area as well as over the magnet assemblies, thereby resulting in magnets that effectively cover a majority surface area of the tool body."[71]  No amount of torturing the simple phrase "covering a majority surface area" can allow for the interpretation that placement of magnets "effectively covers" more than half the tool body when the actual magnets themselves — and not any magnet field — are at issue according to the claim. The language of the Abstracts, the specifications, and the claims is explicit, and cannot be expanded beyond the patent itself. In addition, the drawings accompanying the patents support this interpretation. The requirement that the language of the patent, when read as a whole, be full, clear, concise, and exact, so that inventors are protected but innovation is still permitted, demands that the plain language "covering the majority surface area of the tool body" means exactly that and no more.[72]

## 2. "[D]etachably non-rotatable securing each of said magnet members on said tool body"

This phrase is contained in the independent claims of patent 787,[73] the 781 patent,[74] is referenced in a dependent claim on the 386 patent,[75] an independent claim in patent 539,[76] and an independent claim in patent 117.[77]

As to this phrase, the Court construes the following meaning: each magnet is secured to the tool body in a fashion that prevents it from being able to rotate except with the tool as the

---

[71] Rec. Doc. 203,  page 17.
[72] The Court notes Mr. Ruttley admitted at trial that the Rattler magnets themselves cover a majority of the surface area of the Rattler tool body. Although the Court allowed Mr. Ruttley, as inventor and a person skilled in the field of the invention, to testify as to the claims in the patent, his testimony was not considered to be the best evidence. The Court's decision regarding this phrase was developed from the intrinsic evidence only.
[73] Col. 6, line 17-18.
[74] Col. 6, line 20-21.
[75] Col. 6, line 8-10, with no reference to "non-rotatable."
[76] Col. 6, line 14-15 and Col. 6, line 36-37, with no reference to "non-rotatable."
[77] Col. 7, line 12-13

tool rotates, but that allows the individual magnet to be removed and replaced, if damaged. None of the five Abstracts mentions detachable securing of the magnets.[78]  The 787 patent specification,[79] the 781 patent specification,[80]  the 386 patent specification,[81]  the 539 patent specification,[82]  and the 117 patent specification[83]  reference this particular language.  Further, the 117 patent specifies that "Each magnet member is individually secured and can be replaced, when necessary, without affecting other magnet members…"[84]   Even though the specifications do not go into detail explaining these concepts beyond the language in the 117 patent, the meanings of detachable and non-rotatable are readily apparent.

**3. "[A] magnet protector for each of said magnet members"**

This phrase, "providing a magnet protector for each of said magnet members," is contained in independent claims in the 787 patent,[85]  the 781 patent,[86]  and the 386 patent.[87] It is contained in the Abstracts of the other patents as detailed below.

As to this phrase, the Court construes the following meaning: each magnet has its own protector, that is, a one-to-one correspondence exists between magnets and their protectors. The Abstracts of all five patents explain that "magnet protectors are secured immediately adjacent to a corresponding magnet member."[88]   The five patent specifications state explicitly that "[e]ach

---

[78] Page 1 of each patent contains the Abstract; the Court notes the 787, 781, 386, and 539 Abstracts are identical.
[79] Col. 2, line 66 through col. 3, line2.
[80] Col. 3, line 10-11.
[81] Col. 3, line 10-11.
[82] Col. 3, line 10-11.
[83] Col. 3, line 46-52, without reference to non-rotatable.
[84] Col. 3, line 49-52.
[85] Col. 6, line 24-25.
[86] Col. 6, line 23-24.
[87] Col 5, line 65 through Col. 6, line 1; Col. 6, line 54-56.
[88] 787 patent Abstract, page 1; 781 patent Abstract, page 1; 386 patent Abstract, page 1; 539 patent Abstract, page 1; 117 patent Abstract, page 1, which language states explicitly: "Each magnet member is protected by a magnet protector."

magnet… is provided with a 'heel,' or magnet protector…"[89]  "Each protector member has a triangular cross-section with one side of the protector being longer than the side of the magnet positioned next to it."[90]  "Each magnet member is provided with a protective member, or magnet protector."[91]  The drawings accompanying each of the five patents illustrate that each magnet has its own protector.[92]  The meaning of "a" for "each" is readily apparent.

**4. "[F]or deflecting the striking force of said metal particles"**

This phrase is contained in an independent claim in the 787 patent,[93] a dependent claim in the 781 patent,[94] an independent claim in the 386 patent,[95] and an independent claim in the 117 patent.[96]

As to this phrase, the Court construes the following meaning: the magnet protector prevents debris from hitting the surface of the magnet member when the tool is rotated. The Abstracts of the 787, 781, 386, and 539 patents all explain that a protector deflects particles from hitting a magnet during rotation of the tool. In patents 787, 781, 386, and 539, the Summary of the Invention explains that each protector has a triangular cross section and slanted surface angled in the direction of the rotation of the tool.[97]  The specifications of the 787,[98] the 781,[99]

---

[89] 787 patent, Col. 3, line 30-31; 781 patent, Col. 3, line 41-42; 386 patent, Col. 3, line 41-42; 539 patent, Col. 3, line 41-42; 117 patent, Col. 4, line 13-15; Col. 4, line 36-37; in addition as noted earlier, the Abstract states explicitly: "Each magnet member is protected by a magnet protector."

[90] 787 patent, Col.3, line 31-33; 781 patent, Col. 3, line 42-44; 386 patent, Col. 3, line 42-44; 539 patent, Col. 3, line 42-44;

[91] 787 patent, Col. 4, line 13-15.

[92] See Figure 3 on each of the five patents, and, in addition, figure 4, 12, and 13 of the 117 patent.

[93] Col. 6, line 24-25.

[94] Col. 6, line 32-35. The Court notes the language is slightly different: "each of said magnet protectors deflects a string [sic] force of said metal particles on said magnet members." The Court assumes "string" is a typographical error that should properly read "striking," as it does in the other patents.

[95] Col. 6, line 3-4. The Court notes the language is slightly different: "to protect the corresponding magnet member from striking force of metal particles."

[96] Col. 8, line 33-34. The Court notes the language is slightly different: "for deflecting a striking force of said metal particles on said magnet assemblies."

[97] 787 patent, Col. 2, line 1-3; 781 patent, Col. 2, 10-12; 386 patent, Col. 2, 10-12; 539 patent, Col. 2, 10-12.

[98] Col. 3, line 38-42.

[99] Col. 3, line 49-53.

the 386,[100] and the 539[101] patents all explain the process by which a protector prevents particles from hitting a magnet directly when the tool rotates, instead causing particles to hit the casing wall, get pushed upward, and then attach themselves to the magnets. The specification of the 117 patent contains slightly different language, explaining that the "protectors shield the magnets from a forceful impact with the metal objects attracted by the magnets when the tool is rotated in a well bore."[102] The drawings contained in all five patents support this interpretation as well. Construction of this phrase involves little more than the consistent application of the widely accepted meaning of commonly understood words used throughout the patents.

**5. "[O]ne side of each of said magnet protector with a length greater than a corresponding side of the immediately adjacent magnet member"**

This phrase is contained in an independent claim in the 787 patent,[103] a dependent claim in the 386 patent,[104] and a dependent claim in the 117 patent.[105]

As to this phrase, the Court construes the following meaning: the magnet protector extends farther out from the tool body than the magnet it protects. To put it another way, the magnet protector is "taller" than the magnet it protects, so that during rotation, as described above, the particles hit the casing wall, are pushed upward, and then attach themselves to the magnet surface. The specifications of the 787 patent, [106] the 781 patent,[107] the 386 patent,[108] the 539 patent,[109] and the 117 patent[110] all explain that a protector extends farther out than

---

[100] Col. 3, line 49-53.
[101] Col. 3, line 49-53.
[102] Col. 4, line 42-44.
[103] Col. 6, line 27-29.
[104] Col. 6, line 22-25.
[105] Col. 6, line 56-58.
[106] Col. 3, line 30-36.
[107] Col. 3, line 40-46.
[108] Col. 3, line 40-46.
[109] Col. 3, line 40-46

does its corresponding magnet to protect the magnet when the tool is rotated. The drawings of all five patents support this interpretation as well.

**6. "[L]owering said body into the well bore and imparting rotation to said tool body, thereby creating a magnetic field"**

This phrase is contained in an independent claim in the 787 patent,[111] the 781 patent,[112] and the 117 patent.[113]   In each case, the patent specifies a method including the steps of lowering and rotating the tool.

As to this phrase, the Court construes the following meaning: both steps are required, that is lowering the tool into the well bore, and subsequently rotating the tool, to create the magnetic field described in the language of the claim. In each case, the language of the claim calls for lowering and rotating; the use of the conjunctive "and" does not provide the option of not rotating the tool. The Abstracts of the 787, 781, 386, and 539 patents all explicitly call for rotation, and while the 117 Abstract does not mention rotation, the specifications of all five patents describe what happens "during rotation of the tool."[114]

**7. "[P]rimary metal particles settling area"**

This term is contained in an independent claim in the 781 patent[115] and the 117 patent.[116]

As to this term, the Court construes the following meaning: the first and most important settling area, also implying there is more than one settling area. The claim language of both

---

[110] Col. 4, line 36-43.
[111] Col. 6, line 19-20.
[112] Col. 6, line 28-30.
[113]  Col. 8, line 43-45.
[114] 787 patent, col. 4, line 2-3, 64-5; the 781 patent, col. 4, line 2-3, and col. 5, line 8-9; the 386 patent, col. 4, line 2-3, and col. 5, line 8-9; the 539 patent, col. 4, line 2-3, and col. 5, line 8-9; and the 117 patent with slightly different language, col. 4., line 44, "when the tool body is rotated in a well bore," and col. 4, line 64-65, "When the tool body with the magnets is rotated…"
[115] Col. 6, line 20.
[116] Col. 6, line 31; col. 7, line 14; col. 8, line 8; col. 8, line 27.

patents explicitly states the exterior surface of the magnets defines a primary metal particles

settling area. While the 781 patent Abstract and specification make no special reference to a

primary settling area, the Abstract of the 117 patent explains that each magnet member forms a

primary debris settling area. Further, the specification explains that the primary debris settling

area is "defined by the exterior surface of the magnet member"[117] and a secondary debris settling

area is "defined by a surface, which is located immediately behind the inclined surface of the

protector."[118]  The specification language establishes that there are two distinct settling areas,

with two distinct definitions, when mention is made of primary and/or secondary.

**8. "[T]rap space [or secondary settling area] between each magnet member and a magnet protector of an immediately adjacent magnet member"**

This phrase is contained in an independent claim of the 781 patent,[119] an independent

and dependent claim in the 386 patent,[120] and four independent claims in the 117 patent.[121]

As to this phrase, the Court construes the following meaning: a catch space created

between the exposed side of a magnet and the protector for the next magnet over. The Abstracts

of all five patents refer to this trap space, although the 117 patent language is slightly different,

calling it a secondary debris settling area instead of a trap space. The drawings for all five patents

support this interpretation, illustrating a "valley" created by the fact, as discussed earlier, that the

magnet protector is taller than the next magnet over. The specifications also support this

---

[117] Col. 4, line 45-49.
[118] *Id*.
[119] Col. 6, line 23-26
[120] Col. 6, line 11-14; col. 6, line 56-58
[121] Col. 6, line 45-47, although the language refers to a magnet assembly  instead of magnet member; the magnet assembly in this patent is defined as an elongated magnet and its liner; col. 7, line 18-21, same language; col. 8, line 10-13, same language; col. 8, line 37-40, same language.

interpretation, explaining that cuttings are caught in a trap formed "between a straight side of one magnet and the slanted face of the next magnet protector."[122]

## 9. "[E]longated magnet member"

This term is contained in two independent claims in the 386 patent,[123] an independent claim in the 539 patent,[124] and an independent claim in the 117 patent.[125]

As to this term, the Court construes the following meaning: the actual, physical magnets themselves are elongated, rather than that they may be arranged in an elongated fashion. The drawings of all five patents support this interpretation, each showing explicit illustrations of a long magnet by itself, and also long magnets incorporated into representative drawings of the tool body. The Abstracts of the patents use the word longitudinal to describe the magnet members,[126] which also supports this interpretation.  While this is a widely accepted meaning of a commonly understood word, and not a technical term, out of an abundance of caution the Court also cites the Oxford English Dictionary definition of elongated: "1. Made longer; drawn out or extended to an unusual or unnatural length. 2. That is excessively long in proportion to its breadth, as if drawn out or extended."  The Court is not persuaded that this term can be enlarged to encompass a series of completely round magnets that have been arranged in an "elongated" fashion, as the Plaintiff argues. The requirement that the language of the patent, when read as a whole, be full, clear, concise, and exact, so that inventors are protected but innovation is still permitted, demands that the plain language "elongated magnet member" means exactly that.

---

[122] The 787 patent, col. 3, line 45-47; the 781 patent, col. 3, line 55-57; the 386 patent, col. 3, line 55-57; the 539 patent, col. 3, line 55-57; the 117 patent, col. 4, line 47-49, col. 5, line 39-40 and line 54-56.
[123] Col. 5, line 63-64, col. 6, line 51-52
[124] Col. 6, line 10-11.
[125] Col. 6, line 32.
[126] The Court notes that another embodiment of the tools calls for arcuate magnets, discussed later.

**10. "[A] magnet protector that extends outwardly from an exterior of said tool body"**

This phrase is contained an independent claim in the 386 patent,[127] and an independent claim in the 117 patent.[128]

As to this phrase, the Court construes the following meaning: each magnet protector extends beyond the outer circumference of the tool body in such a manner as to create an uneven surface on the exterior of the tool. The drawings accompanying all five patents support this interpretation, illustrating a cross section of the tool with a near pinwheel appearance. The patent specifications, as addressed in numbers four and five above, explicitly explain that the protectors are taller, or farther out from the tool body, than are the magnets, to deflect the striking force of particles and to create trap spaces for secondary settling areas during rotation of the tool. Conformity with previous constructions of phrases associated with magnet protectors supports this interpretation. The requirement that the language of the patent, when read as a whole, be full, clear, concise, and exact, so that inventors are protected but innovation is still permitted, demands that the plain language "extending outwardly" means exactly that and no less.

**11. "[E]ach of said magnet members having an arcuate cross section"**

This phrase is contained in two independent claims in the 539 patent.[129]

As to this phrase, the Court construes the following meaning: each magnet itself has a cross section that is curved like a bow, or arc-shaped. The drawings of the 787, 781, 386, and 539 patents support this interpretation even though the arcuate magnets are specifically claimed only in the 539 patent. The drawings in those four patents illustrate one example of the tool with elongated magnets and one with arcuate magnets. The Abstracts of those four patents support

---

[127] Col. 6, line 1-2.
[128] Col. 6, line 41-42; col. 7, line 16-17.
[129] Col. 6, line 15-56; Col. 6,  line 35-36.

this interpretation as well, by explaining that magnets with an arcuate cross section are one of the options for the patented device, the other being, as discussed earlier, longitudinal magnets.

While this is not a technical term, out of an abundance of caution the Court also cites the Oxford English Dictionary definition of arcuate: "Curved like a bow, arc-shaped, arched," as additional support for this interpretation.

### 12. "Magnet liner"

This term is contained an independent claim in the 117 patent,[130] as well as a dependent claim in the 117 patent.[131]

As to this term, the Court construes the following meaning: an individual separating device, distinct from the protector, which is inserted into a tool body recess, and then has a magnet placed into it.  This interpretation is supported by the summary of the invention.[132] The specification also supports this interpretation: "A magnet liner is positioned inside each recess in contact with the surface… A magnet member is placed above the liner, and securing lugs are placed over the magnet…"[133]  "Each magnet liner is configured to match the profile of the magnet, the recess and the lugs."[134]  "Each magnet protector has a first surface which contacts the liner…"[135]  "[E]ach recess holds a liner and a magnet."[136]  The drawing in the 117 patent also supports this interpretation. Construction of this phrase involves little more than the application of the widely accepted meaning of commonly understood words used in the patent.

---

[130] Col. 6, line 36-39; col. 8, line 3-6; col. 8, 27-29.
[131] Col. 7, line 26-29.
[132] Col. 2, line 29-32.
[133] Col. 3, line 38-41.
[134] Col. 4, line 23-25.
[135] Col. 4, line 37-38.
[136] Col. 5, line 30-31

**13. "L-shaped magnet liner"**

This term is contained in an independent claim in the 117 patent.[137]

As to this term, the Court construes the following meaning: the liner itself is in the actual shape of the letter "L." The specification supports this interpretation: "Fig. 10 illustrates a side view of an L-shaped magnet liner,"[138]  as does the drawing in Figure 11.  Construction of this phrase involves little more than the application of the widely accepted meaning of commonly understood words used in the patent.


**CONSTRUCTION OF THE CLAIM ELEMENTS**

The Court finds that after incorporating the meanings of the disputed terms as ordered above, the claims of the five patents at issue, as a matter of law, are hereby construed to have the following meaning and scope for the purposes of this suit. The Court exercises its discretion to focus on the portions of the claims in dispute, and for clarity has condensed the language. Again, the Court notes that since the five Rattler patents share many common terms, it will interpret the claims consistently across all the asserted patents.


**The 787 Patent**

The one independent method claim contains six limitations, or elements:

1)  a tool body with a central opening;

2)  magnets physically covering more than half the tool surface, with a settling area created by the exposed surfaces of the magnets themselves;

3)  each magnet is detachably secured to prevent its rotating in relation to the tool body;

4)  lowering and rotating the tool creates a magnetic field which draws particles;

---

[137] Col. 8, line line2-4.
[138] Col. 4, line 21-22.

5)  each magnet has a corresponding magnet protector to prevent particles from hitting the exposed surface of the magnet;

6)  each magnet protector extends further outside the tool body than does the magnet it protects, to prevent metal particles from striking the magnet.


**The 781 Patent**

The one independent method claim contains five limitations, or elements:

1)  a tool body with a central opening;

2)  magnets physically covering more than half the tool surface, with a primary settling area created by the exposed surfaces of the magnets themselves;

3)  each magnet is detachably secured to prevent its rotating in relation to the tool body;

4)  each magnet has a corresponding magnet protector, and the space between a magnet protector and the next magnet over creates a trap space that functions as a secondary settling area;

5)  lowering and rotating the tool creates a magnetic field which draws particles.


**The 386 Patent**

There are two independent apparatus claims in dispute.

Claim one, the first independent claim, contains three limitations, or elements:

1)  a tool body with a central opening;

2)  elongated magnets physically covering more than half the tool surface;

3)  each elongated magnet has a corresponding magnet protector which extends beyond the outer surface of the tool body, so the magnet protector prevents particles from hitting the exposed surface of the magnet and also so that a space remains between a protector and the next magnet over.

27

Claim ten, the second independent claim, contains three limitations, or elements:

1)  a tool body with a central opening;

2)  elongated magnets physically covering more than half the tool surface;

3)  each elongated magnet has a corresponding magnet protector, and the space between a magnet protector and the next magnet over creates a trap space.

4)

**The 539 Patent**

Two independent apparatus claims in dispute.

Claim one, the first independent claim, contains four limitations, or elements:

1)  a tool body with a central opening;

2)  elongated magnets physically covering more than half the tool surface, with a settling area created by the exposed surfaces of the magnets themselves;

3)  each pair of elongated magnets is detachably secured to the tool body;

4)  each magnet has an arcuate cross section.


Claim four, the second independent claim, contains five limitations, or elements:

1)  a tool body with a central opening;

2)  magnets physically covering more than half the tool surface, with a settling area created by the exposed surfaces of the magnets themselves;

3)  each magnet is detachably secured to the tool body;

4)  each magnet has an arcuate cross section;

5)  the exterior surface of each magnet forms a particle settling surface.

**The 117 Patent**

Three independent apparatus claims and one independent method claim in dispute.

Claim one, the first independent apparatus claim, contains five limitations, or elements:

1)  a tool body with a central opening;

2)  sets of magnet assemblies, each containing one magnet liner and one magnet fitted into a recess in the tool body, secured on the tool body in a non-coaxial relationship to each other;

3)  elongated magnets, the exposed surface of which create a primary settling area;

4)  each elongated magnet has a corresponding magnet protector which extends beyond the outer surface of the tool body;

5)  spaces between the magnet protectors and the next magnets over create multiple secondary settling areas.


Claim eight, the second independent apparatus claim, contains six limitations, or elements:

1)  a tool body with a central opening;

2)  sets of magnet assemblies, each containing one magnet detachably secured on the tool body in a coaxial relationship to each other;

3)  the exposed surface of each magnet creates a primary settling area;

4)  each magnet has a corresponding magnet protector which extends beyond the outer surface of the tool body;

5)  spaces between the magnet protectors and the next magnets over create multiple secondary settling areas;

6)  each secondary settling area has at least half the surface area as the next magnet.

Claim 12, the third independent apparatus claim, contains six limitations, or elements:

1)  a tool body with a central opening and multiple recesses;

2)  sets of magnet assemblies, each containing one L-shaped magnet liner and one magnet fitted into a corresponding recess in the tool body, in a coaxial relationship to each other;

3)  the exposed surface of each magnet creates a primary settling area;

4)  a magnet protector formed by the tool body next to each magnet assembly;

5)  secondary settling areas created by the tool body in locations between a magnet assembly and a magnet protector of the next magnet over;

6)  each secondary settling area has at least half the surface area as the next magnet.


Claim 14, the fourth independent (method) claim, contains seven limitations, or elements:

1)  a tool body with a central opening;

2)  more than one magnet assembly, each containing one magnet liner and one magnet secured into a recess in the tool body, secured on the tool body in a non-coaxial relationship to each other;

3)  the exposed surface of each magnet creates a primary settling area;

4)  each magnet has a corresponding magnet protector to prevent particles from hitting the exposed surface of the magnet;

5)  secondary settling areas for attracting particles by a residual magnetic force created by the assemblies, defined by the tool body in locations between a magnet assembly and a magnet protector of the next magnet over;

6)  each secondary settling area has at least half the surface area as the next magnet;

7)  lowering and rotating the tool creates a magnetic field which draws particles to the primary and secondary settling areas.

**PART TWO: ALLEGED INFRINGEMENT OF THE RATTLER PATENTS AS A MATTER OF FACT**

In conformity with *Markman,* the Court next addresses the second requirement of the two-part inquiry: whether the Bilco Tough Boy tool infringes on one or more of the Rattler patents' claims as construed by the Court.[139]  Rattler must show by a preponderance of the evidence that each element of any allegedly-infringed claim is contained in Bilco's tool, either literally or under the doctrine of equivalents, as discussed above. Again, for the sake of clarity, the Court exercises its discretion to analyze the potential infringement of the Bilco tool as compared to each of the allegedly-infringed claims in the five patents.

The Court considered all the factual evidence presented at trial along with the exhibits, with particular regard to the trial testimony of Mr. David Ruttley, vice president and operations manager of Deltide Fishing & Rental Tools, president of Rattler tools, the inventor of the Rattler tool, and a person skilled in the field of the invention; Mr. Lubbert Westra, an expert in downhole retrieval tools with substantial experience in designing and manufacturing tools with magnets for downhole use;[140]  Thomas Ashy, wellbore cleanout product line manager for Baker Oil Tools, part owner of a fishing tools company, former department head for Bilco, and a person skilled in the field of the invention; and the photographs of the Bilco tool contained in Exhibit 4.

---

[139] *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc).
[140] Westra's report was written to compare the Bilco tool as it existed to the five patents in question in this case in a technical manner, and as an expert in the field of the invention, he is qualified to do that.

**Infringement Analysis of the Bilco Tool as compared to the 787 Patent**

*Claim one:*

1) *a tool body with a central opening;*

The Bilco tool has a tool body with a central opening; this element was not disputed.

2) *magnets physically covering more than half the tool surface, with a settling area created by the exposed surfaces of the magnets themselves;*

The Bilco tool does not have magnets covering more than half the surface area of the tool, and the exposed surfaces of the Bilco tool do not create a settling area. Mr. Westra testified the Bilco tool uses small cylindrical magnets which, when conservatively estimated without including the subs on either end of the tool, cover only 20 percent of the tool body.[141] This testimony is supported by Mr. Westra's expert report, which provided calculations of the area of the tool body for the Bilco tool and the area covered by magnets.[142]

Although the purpose of both the Rattler and Bilco tools is to collect metal debris from a wellbore, Mr. Westra's, Mr. Ruttley's,[143] and Mr. Ashy's testimony support that the tools do not accomplish this task in substantially the same way. The Bilco magnets are approximately seven-eighths of an inch in diameter and approximately three-eighths of an inch in height, and one Bilco tool contains from 192 to 240 button magnets, depending on the tool diameter. Mr. Ruttley testified that the Rattler tool contains 21 magnets, with the surfaces of the magnets largely exposed to create the primary settling area, as the magnets themselves provide the strongest magnetic force. Further, he testified that exposed magnets, which offer direct contact to debris,

---

[141] The 7-inch Bilco tool contains 192 button magnets; the 9-inch tool contains 240 magnets.

[142] Mr. Westra's calculations from his expert report, exhibit 40: The 7-inch tool has an outer area of 543.9 sq. in.; the magnets cover 115.5 sq. in., for a total of 21.24% surface coverage; the 9-inch tool has an outer area of 711.7 sq. inc; the magnets cover 144.3 sq. in., for a total of 20.28% of the surface coverage.

[143] The Court notes that Mr. Ruttley testified primarily as to construction and design of the Rattler tool. The substance of this case, however, involves analysis of whether the Bilco tool infringes on any Rattler patent claims, not on the tool as actually built by Rattler. As such, Mr. Ruttley's testimony is irrelevant for the purposes of analyzing whether Bilco literally infringes on Rattler patents, and is only considered when examining whether the Bilco tool infringes on any Rattler patent based upon the doctrine of equivalents.

is one of the unique features of the patent. In contrast, when encased in their carriers, the Bilco magnets are virtually unexposed to the surface, because the magnets and carriers are contained within the tool body. Mr. Westra testified the small holes in the carrier are approximately one-quarter of an inch in diameter, and thus cannot realistically collect debris. Only 10 percent of the Bilco magnet is exposed when the magnets are placed in their carriers, according to his expert report. Instead, the evidence supports that the holes have two purposes: one to allow the magnets to be taken out of the carriers easily when the tool is serviced, without damaging the carriers or button magnets, and the other to prevent the trapping of atmospheric pressure that, if strong enough, could deform or even collapse a tool body. Mr. Westra admitted that if particles were tiny they could adhere to the magnets themselves, but as a factual matter, the Court finds this technicality does not equate to collecting debris in substantially the same way. Mr. Ashy testified that he designed the Bilco to have a slick outside diameter so it was easily cleaned in the field, inexpensive to manufacture, and the magnets, purchased in bulk at low prices, would be easy and cheap to replace.

After research and testing, Mr. Ashy chose inexpensive, non-proprietary button magnets, about the size of a quarter, easily purchased in bulk and available onsite without specialized ordering or storage. Mr. Ashy testified the function of the holes in the Bilco magnet carrier is to allow carriers to be removed from recesses in the tool body, because he designed a disassembly tool that allowed removal of the carriers without damaging the carriers. The Rattler tool, by contrast, is more faceted, has hiding places between the magnets and protectors that inhibit easy, quick cleaning of the tool surface. In addition, the Rattler magnets themselves come from a proprietary design that is the property of Rattler Tools, and is a significant part of the tool. Further, Mr. Ashy testified that the Rattler tool collected approximately 10 pounds of

debris in a test comparing it to a tool manufactured by SPS, which collected 12 pounds of debris. After Mr. Ashey designed the Bilco tool[144] and performed the same test, the Bilco tool collected 22 pounds of debris. Plaintiff offered insufficient evidence to dispute Mr. Ashy's or Mr. Westra's testimony.

     *3) each magnet is detachably secured to prevent its rotating in relation to the tool body;*
The Bilco tool does not meet this element. With respect to the detachment capability, the Bilco tool does not contain individually secured magnets that may be replaced without affecting other magnets. As demonstrated during the trial from the pictures of the Bilco tool,[145] the Bilco tool uses a carrier containing four magnets, which carrier must be removed from its place inside the tool body to replace any magnet. With respect to rotation, Mr. Westra testified the Bilco magnets can rotate in relation to the tool body, because there is enough play inside the carrier. While the ability of the magnets to rotate in relation to the tool body does not seem to be a key feature of the Bilco tool, it is nevertheless true that they are not prevented from rotating by being individually secured, because they are placed in groups of four inside a carrier that is secured to the tool body.

     *4) lowering and rotating the tool creates a magnetic field which draws particles;*
The Bilco tool does not require rotation although it is lowered into a wellbore. Mr. Westra testified the Bilco tool is not rotated as a matter of standard procedure, although he admitted that it was capable of rotation. Further, he testified a work string can be rotated only if it is specially arranged to be rotated.  The required rotation of the Rattler patents means the Bilco and Rattler tools do not accomplish the objective of rotating to create a magnetic field to draw particles in substantially the same way. Mr. Ruttley admitted that the method claims for

---

[144] Mr. Ashy admitted that the idea of dovetailing the tool body to hold the magnetic carriers was not original to him, but to Mr. Theriot, whose name is on the Bilco patent, and who did not testify at trial.
[145] Exhibit 7.

his patents necessarily require rotation, and that the magnetic field created by rotation of the tool increased the amount of debris attracted to the tool.

      5)  *each magnet has a corresponding magnet protector to prevent particles from hitting the exposed surface of the magnet;*

      The Bilco tool does not contain this element. Mr. Westra testified that high grade magnets tend to be brittle and chip if they are hit by debris. If a tool containing exposed magnets is rotated in a right-hand manner downhole, a force factor would cause particles to slam into the leading edge of the magnets, and consequently a protector would be necessary to prevent damage to the magnets. Mr. Westra testified that in the Bilco tool, the magnets and magnet carriers are contained within the tool body, and therefore require no protectors, since particles do not slam into the exposed surface of the magnets. The carrier is not a protector, but instead prevents magnets from falling out of the tool. This testimony, which was not sufficiently refuted by the Plaintiff, supports the analysis that the Bilco tool does not perform in substantially the same manner as the Rattler claim.

      6)  *each magnet protector extends farther outside the tool body than does the magnet it protects, to prevent metal particles from striking the magnet.*

      The Bilco tool does not contain this element. Mr. Westra's testimony supports this analysis. As he explained, when fluid is pumped through the center of a tool in a wellbore, it circulates back up the annulus towards the surface, where it is filtered, debris is removed, and it is then circulated downhole again. The larger the diameter of the tool, the faster fluid flows as a result of increased pressure. When a tool is rotated, ferrous particles contained in the fluid slam into the magnets. A magnet protector deflects these particles that otherwise might damage the magnets during rotation. However, the Bilco tool does not have magnets on the surface of the tool to protect. Further, the Bilco tool was not designed to rotate, so its magnets need no special

protection from particles slamming up against them as the tool is rotated. Again, Mr. Westra admitted that the tool could be rotated, but the recessed magnets remove the need for magnet protectors that extend out from the tool body to shield magnets during rotation.

The Bilco tool does not meet every element of the independent claim of the 787 patent, either literally or by applying the doctrine of equivalents. Therefore, the Court finds that the Bilco tool does not infringe the 787 patent.


**Infringement Analysis of the Bilco Tool as compared to the 781 Patent**

*Claim one:*

*1)  a tool body with a central opening;*
The Bilco tool has a tool body with a central opening; this element was not disputed.

*2)  magnets physically covering more than half the tool surface, with a primary settling area created by the exposed surfaces of the magnets themselves;*
As discussed in the 787 patent analysis, the Bilco tool does not have magnets covering more than half the surface area of the tool, and the exposed surfaces of the Bilco magnets do not create a primary settling area.

*3)  each magnet is detachably secured to prevent its rotating in relation to the tool body;*
As discussed in the 787 patent analysis, the Bilco tool does not contain individually secured magnets, preventing their rotation in relation to the tool body, which may be replaced without affecting other magnets.

*4)  each magnet has a corresponding magnet protector, and the space between a magnet protector and the next magnet over creates a trap space that functions as a secondary settling area;*

As discussed in the 787 patent analysis, each Bilco magnet does not have a corresponding magnet protector, because the tool design embeds the magnets inside the tool body and a carrier. Consequently, there is no space created between a magnet protector and the next magnet over that creates a trap acting as a secondary settling area. The Bilco tool has a slick outside diameter, as Mr. Ashy testified, which is designed to be quickly and easily cleaned at the rig site by a worker using gloves and a mop, so the tool does not perform in substantially the same manner as the Rattler claim.

5)  *lowering and rotating the tool creates a magnetic field which draws particles.*
As discussed in the 787 patent analysis, the Bilco tool does not require rotation.

The Bilco tool does not meet every element of the independent claim of the 781 patent, either literally or by applying the doctrine of equivalents. Therefore, the Court finds that the Bilco tool does not infringe the 781 patent.

**Infringement Analysis of the Bilco Tool as compared to the 386 Patent**

*Claim one:*

1)  *a tool body with a central opening;*
The Bilco tool has a tool body with a central opening; this element was not disputed.

2)  *elongated magnets physically covering more than half the tool surface;*
The Bilco tool does not meet this element. As Mr. Westra testified, the Bilco magnets are not elongated. Instead they are button magnets, approximately seven-eighths of an inch in diameter. There is a difference between an elongated magnet and a series of magnets arranged in an elongated, or linear, fashion. An elongated magnet produces a different magnetic field than a series of button magnets. Mr. Ashy testified he chose button magnets when he designed the tool because he was trying to build an inexpensive magnetic retrieval tool that used easily-obtained,

37

inexpensive magnets, making both manufacture and repair in the field affordable. Mr. Ruttley testified the Rattler tool contains approximately 21 elongated proprietary magnets, which comprise a Rattler trade secret. The Bilco tool does not perform in substantially the same way as the Rattler claim.

3)  *each elongated magnet has a corresponding magnet protector which extends beyond the outer surface of the tool body, so the magnet protector prevents particles from hitting the exposed surface of the magnet and also so that a space remains between a protector and the next magnet over.*

The Bilco tool does not contain this element. As discussed in the 787 patent analysis, each magnet does not have a corresponding magnet protector. As discussed in the second element of this claim, the Bilco magnets are not elongated. As discussed in the 787 patent analysis, the Bilco magnets are embedded in the tool body, do not require magnet protectors, and no space is created between a magnet protector and the next magnet over.

The Bilco tool does not meet every element of the independent claim one of the 386 patent, either literally or by applying the doctrine of equivalents. Therefore, the Court finds that the Bilco tool does not infringe claim one of the 386 patent.

### Claim 10:

1)  *a tool body with a central opening;*
The Bilco tool has a tool body with a central opening; this element was not disputed.

2)  *elongated magnets physically covering more than half the tool surface;*
As discussed in the 787 patent analysis, the Bilco tool does not have magnets covering more than half the surface area of the tool. As discussed in the second element of claim one of this patent, the Bilco magnets are not elongated.

*3)   each elongated magnet has a corresponding magnet protector, and the space between a magnet protector and the next magnet over creates a trap space.*

The Bilco tool does not contain this element. As discussed in the 787 patent analysis, each magnet does not have a corresponding magnet protector. As discussed in the second element of claim one of this patent, the Bilco magnets are not elongated. As discussed in the third element of claim one of this patent, the Bilco magnets are embedded in the tool body, do not require magnet protectors, and no space is created between a magnet protector and the next magnet over.

The Bilco tool does not meet every element of the independent claim 10 of the 386 patent, either literally or by applying the doctrine of equivalents. Therefore, the Court finds that the Bilco tool does not infringe claim 10 of the 386 patent.

**Infringement Analysis of the Bilco Tool as compared to the 539 Patent**

*Claim one:*

*1)   a tool body with a central opening;*

The Bilco tool has a tool body with a central opening; this element was not disputed.

*2)   elongated magnets physically covering more than half the tool surface, with a settling area created by the exposed surfaces of the magnets themselves;*

As discussed in the 386 patent analysis, the Bilco magnets are not elongated. As discussed in the 787 patent analysis, the Bilco tool does not have magnets covering more than half the surface area of the tool, and the exposed surfaces of the Bilco magnets do not create a settling area. Mr. Westra testified that tiny particles could settle onto the one-quarter inch in diameter exposed surface of the button magnets, but as a factual matter, the Court finds this technicality does not equate to collecting debris in substantially the same way.

*3)  each pair of elongated magnets is detachably secured to the tool body;*

As discussed in the 386 patent analysis, the Bilco magnets are not elongated. As discussed in the 787 patent analysis, the Bilco magnets are not individually detachably secured to the tool body, but are instead housed in groups of four inside the Bilco carriers, which are secured inside the tool body.

*4)  each magnet has an arcuate cross section (i.e., curved like a bow, or arc-shape).*

The Bilco tool does not contain this element. Mr. Westra and Mr. Ashey both testified that the Bilco tool uses cylindrical, or wafer, magnets. A cross section of a cylinder is a rectangle, not an arc shape. This finding is not a mere technicality; Bilco magnets are embedded in the tool body inside carriers, thus they do not function in the substantially the same way as an elongated magnet with an arcuate cross-section, mounted on the surface of the tool body with an exposed surface that creates a settling area.

The Bilco tool does not meet every element of the independent claim one of the 539 patent, either literally or by applying the doctrine of equivalents. Therefore, the Court finds that the Bilco tool does not infringe claim one of the 539 patent.

**Claim four:**

*1)  a tool body with a central opening;*

The Bilco tool has a tool body with a central opening; this element was not disputed.

*2)  magnets physically covering more than half the tool surface;*

As discussed in the 787 patent analysis, the Bilco tool does not have magnets covering more than half the surface area of the tool.

*3)  each magnet is detachably secured to the tool body;*

As discussed in the 787 patent analysis, the Bilco tool does not contain individually

secured magnets which may be replaced without affecting other magnets.

*4)  each magnet has an arcuate cross section (i.e., curved like a bow, or arc-shape);*

As discussed in element four of claim one of this patent, the Bilco magnets do not have

an arcuate cross section.

*5)  the exterior surface of each magnet forms a particle settling surface.*

As discussed in the 787 patent analysis, the Bilco magnets do not form a settling surface.

Mr. Westra testified that tiny particles could settle onto the one-quarter inch in diameter exposed

surface of the button magnets, but as a factual matter, the Court finds this technicality does not

equate to collecting debris in substantially the same way.

The Bilco tool does not meet every element of the independent claim four of the 539

patent, either literally or by applying the doctrine of equivalents. Therefore, the Court finds that

the Bilco tool does not infringe claim four of the 539 patent.


**Infringement Analysis of the Bilco Tool as compared to the 117 Patent**

*Claim one:*

*1)  a tool body with a central opening;*

The Bilco tool has a tool body with a central opening; this element was not disputed.

*2)  sets of magnet assemblies, each containing one magnet liner and one magnet fitted
into a recess in the tool body, secured on the tool body in a non-coaxial relationship to each
other;*

The Bilco tool does not contain this element. Mr. Ruttley testified the purpose of a

magnet liner is to insulate the magnetic forces from the tool body. Mr. Westra and Mr. Ashy

testified the Bilco carrier is not a liner, but a housing to keep the magnets in the tool body. The Bilco tool contains sets of carriers, with each carrier containing four small cylindrical magnets, which may be arranged either in a coaxial or non-coaxial relationship; the carriers are embedded in the tool body in dovetailed slots.

3)  *elongated magnets, the exposed surface of which create a primary settling area;*

As discussed in the 386 patent analysis, the Bilco tool does not contain elongated magnets, and does not contain exposed magnet surfaces which create a primary settling area.

4)  *each elongated magnet has a corresponding magnet protector which extends beyond the outer surface of the tool body;*

As discussed in the 386 patent analysis, the Bilco tool does not contain individual magnet protectors for each magnet; outwardly extending magnet protectors are unnecessary as the Bilco magnets are embedded in the tool body in carriers.

5)  *spaces between the magnet protectors and the next magnets over create multiple secondary settling areas.*

As discussed in the 787 patent analysis, the Bilco tool does not have magnet protectors. Consequently, there is no space created between magnet protectors and the next magnet over that creates secondary settling areas. The Bilco tool has a slick outside diameter, designed to be quickly and easily cleaned at the rig site by a worker using gloves and a mop, so the tool does not perform in substantially the same manner as the Rattler claim.

The Bilco tool does not meet every element of the independent claim one of the 117 patent, either literally or by applying the doctrine of equivalents. Therefore, the Court finds that the Bilco tool does not infringe claim one of the 117 patent.

***Claim eight:***

*1)  a tool body with a central opening;*

The Bilco tool has a tool body with a central opening; this element was not disputed.

*2)  sets of magnet assemblies, each containing one magnet detachably secured on the tool body in a coaxial relationship to each other;*

As discussed in element two of claim one of this patent, the Bilco tool does not contain magnet assemblies each containing one magnet, but instead features carriers housing four magnets each. As discussed in the 787 patent analysis, each Bilco magnet is not detachably secured in such a manner that allows it to be removed without affecting other magnets.

*3)  the exposed surface of each magnet creates a primary settling area;*

As discussed in the 787 patent analysis, the exposed surfaces of the Bilco magnets do not create a primary settling area.

*4)  each magnet has a corresponding magnet protector which extends beyond the outer surface of the tool body;*

As discussed in the 386 patent analysis, the Bilco tool does not contain individual magnet protectors for each magnet; outwardly extending magnet protectors are unnecessary as the Bilco magnets are embedded in the tool body in carriers.

*5)  spaces between the magnet protectors and the next magnets over create multiple secondary settling areas;*

As discussed in the 787 patent analysis, the Bilco tool does not have magnet protectors. Consequently, there is no space created between magnet protectors and the next magnet over that creates secondary settling areas. The Bilco tool has a slick outside diameter, designed to be quickly and easily cleaned at the rig site by a worker using gloves and a mop, so the tool does not perform in substantially the same manner as the Rattler claim.

*6)  each secondary settling area has at least half the surface area as the next magnet.*

The Bilco tool does not contain this element. The Bilco tool does not create primary and secondary settling areas, but has a slick outside diameter, as Mr. Ashy testified.

The Bilco tool does not meet every element of the independent claim eight of the 117 patent, either literally or by applying the doctrine of equivalents. Therefore, the Court finds that the Bilco tool does not infringe claim eight of the 117 patent.

### *Claim 12:*

*1)  a tool body with a central opening and multiple recesses;*

The Bilco tool has a tool body with a central opening and with multiple recesses; this element was not disputed.

*2)  sets of magnet assemblies, each containing one L-shaped magnet liner and one magnet fitted into a corresponding recess in the tool body, in a coaxial relationship to each other;*

As discussed in element two of claim one of this patent, the Bilco tool does not contain magnet assemblies each containing one magnet. As Mr. Westra testified, the Bilco tool does not contain L-Shaped liners. Bilco magnets are housed in groups of four in a carrier embedded in the tool body in dovetailed slots, and may be arranged in a coaxial or non-coaxial relationship, but do not perform substantially the same function as the claim of the Rattler patent.

*3)  the exposed surface of each magnet creates a primary settling area;*

As discussed in the 787 patent analysis, the exposed surfaces of the Bilco magnets do not create a primary settling area.

*4)   a magnet protector formed by the tool body next to each magnet assembly;*

The Bilco tool does not contain this element. As Mr. Westra and Mr. Ashy testified, the Bilco carriers are embedded into the tool body in dovetailed slots, and so do not require or contain magnet protectors.

*5)   secondary settling areas created by the tool body in locations between a magnet assembly and a magnet protector of the next magnet over;*

As discussed in the 787 patent analysis, the Bilco tool does not have magnet protectors. Consequently, there is no space created between magnet protectors and the next magnet assembly over to create secondary settling areas.

*6)   each secondary settling area has at least half the surface area as the next magnet.*

As discussed in element six of claim eight of this patent, the Bilco tool does not  create primary and secondary settling areas, but has a slick outside diameter.

The Bilco tool does not meet every element of the independent claim 12 of the 117 patent, either literally or by applying the doctrine of equivalents. Therefore, the Court finds that the Bilco tool does not infringe claim 12 of the 117 patent.

***Claim 14:***

*1)   a tool body with a central opening;*

The Bilco tool has a tool body with a central opening; this element was not disputed.

*2)   more than one magnet assembly, each containing one magnet liner and one magnet secured into a recess in the tool body, secured on the tool body in a non-coaxial relationship to each other;*

As discussed in element two of claim one of this patent, the Bilco tool does not feature magnet assemblies each containing one magnet. Bilco magnets are housed in groups of four in a carrier embedded in the tool body and may be arranged in a coaxial or non-coaxial relationship.

*3)   the exposed surface of each magnet creates a primary settling area;*

As discussed in the 787 patent analysis, the exposed surfaces of the Bilco magnets do not create a primary settling area.

*4)   each magnet has a corresponding magnet protector to prevent particles from hitting the exposed surface of the magnet;*

As discussed in the 787 patent analysis, each magnet does not have a corresponding magnet protector.

*5)   secondary settling areas for attracting particles by a residual magnetic force created by the assemblies, defined by the tool body in locations between a magnet assembly and a magnet protector of the next magnet over;*

As discussed in the 787 patent analysis, the Bilco tool does not have magnet protectors. Consequently, there is no space created between magnet protectors and the next magnet assembly over to create secondary settling areas for particles drawn by residual magnetic force.

*6)   each secondary settling area has at least half the surface area as the next magnet;*

As discussed in element six of claim eight of this patent, The Bilco tool does not  create primary and secondary settling areas, but has a slick outside diameter.

*7)   lowering and rotating the tool creates a magnetic field which draws particles to the primary and secondary settling areas.*

As discussed in the 787 patent analysis, the Bilco tool does not require rotation.

The Bilco tool does not meet every element of the independent claim 14 of the 117 patent, either literally or by applying the doctrine of equivalents. Therefore, the Court finds that the Bilco tool does not infringe claim 14 of the 117 patent.

46

**ALLEGED WILLFUL INFRINGEMENT OF THE RATTLER PATENTS**

Even though the Court finds no infringement of the Rattler patents, out of an abundance of caution it addresses the issues of willful behavior on the part of Bilco or Mr. Coyle. The Court considered the trial testimony of Mr. Stephen Moody, former warehouse manager for Deltide Fishing & Rental Tools; and Mr. Michael Borne, sales employee at E&E Machine Service and former machinist.

Before trial, Defendants moved to exclude evidence of the settlement, compromise and consent judgments reached between Rattler Tools, Inc., and Clayton Theriot, Sr., and Dennis J. Pennison, claiming it was inadmissible pursuant to Federal Rule of Evidence 408(a).[146] Plaintiffs requested that the Court take judicial notice of the settlements and consent judgments, which it did. The Court also takes judicial notice of the fact that neither of those defendants was represented by counsel; neither was still employed by defendant Bilco at the time of the settlement; Plaintiffs offered to dismiss those defendants from the litigation in exchange for their cooperation; and Plaintiffs drafted the consent judgments. The settlements signed by Mr. Theriot and Mr. Pennison may only be used against the parties who signed them,[147] and, particularly in light of the fact that the Court finds no patent infringement, are irrelevant for the purposes of defendants Bilco and Mr. Coyle.

Rattler has not proved any acts which would support an allegation of alter ego or requiring a piercing of the corporate veil, nor has Rattler proved that Mr. Coyle attempted to or

---

[146] "(a) Prohibited uses. — Evidence of the following is not admissible on behalf of any party, when offered to prove liability for, invalidity of, or amount of a claim that was disputed as to validity or amount, or to impeach through a prior inconsistent statement or contradiction: (1) furnishing or offering or promising to furnish — or accepting or offering or promising to accept — a valuable consideration in compromising or attempting to compromise the claim; and (2) conduct or statements made in compromise negotiations regarding the claim, except when offered in a criminal case and the negotiations related to a claim by a public office or agency in the exercise of regulatory, investigative, or enforcement authority." F.R.E. 408(a).

[147] La. Civil Code Art. 1853. Judicial confession: "A judicial confession is a declaration made by a party in a judicial proceeding. That confession constitutes full proof against the party who made it."

even believed that the Bilco tool infringed on any of Rattler's patents. Plaintiff's witness,

Mr. Moody, testified that he had no personal knowledge that any Bilco employee removed a

magnet from the Mag Trap while it was at the Bilco warehouse, or that Mr. Coyle directed any

Bilco employee to remove the magnet. In addition, Mr. Moody testified that he did not see Mr.

Coyle when he went to Bilco to redress the Rattler Mag Trap for delivery to Shell. Plaintiff

offered no other evidence of Mr. Coyle's activities related to the Mag Trap, and did not call Mr.

Coyle as a witness at trial.

Plaintiff offers the depositions of Mr. Coyle post-trial as evidence supporting its claims of

willful infringement on the part of Mr. Coyle. The Court has found no patent infringement, so

there can be no finding of willful infringement. Further, the depositions were not introduced at

trial, and no trial testimony by Plaintiff developed the theory of Mr. Coyle's willful

infringement. The depositions were permitted to be introduced into evidence only as bona fide

rebuttal against testimony presented at trial by the Defendants.


## PART THREE: STATE LAW CLAIMS AGAINST DEFENDANTS BILCO AND WILLIAM COYLE, JR.

On January 17, 2007, Plaintiff filed a Second Amended Complaint against Defendants,[148]

claiming violations of Louisiana law, including unfair trade practices, unfair competition,

misappropriation of trade secrets and unjust enrichment. In support of their claim, Plaintiff

alleged: 1) Defendants had full access to Plaintiff's drawings and specifications for Rattler's

magnetic retrieval tool ("Mag Trap") and missapropriated Rattler's trade secrets when

manufacturing the Bilco tool ("Tough Boy"); 2) Bilco employees disassembled a Mag Trap tool

in their shop to aid them in copying its design; 3) Defendants violated the duty of good faith and

---

[148] Doc. 102.

fair dealing and breached their contracts with Rattler; and 4) Defendants violated Louisiana Uniform Trade Secrets Act and the Louisiana Unfair and Deceptive Trade Practices Act, and should pay damages and be enjoined permanently from competing unfairly with Plaintiff. At the close of the Plaintiff's case in chief, the Defendants moved to dismiss the state law claims. Out of an abundance of caution, the Court took the motion under advisement. Having considered the evidence, and for the following reasons, the Court finds Plaintiff has not established its State law claims by a preponderance of the evidence and Plaintiff is not entitled to the relief it seeks.

1) Plaintiffs did not establish Defendants had full access to Rattler's drawings and specifications. At trial, David Ruttley, Vice President and Operations Manager for Deltide, President of Rattler, and inventor of the Mag Trap, testified that he hired E&E Machine Shop to build two Mag Traps for testing in the Spring of 2002. It was not until the current litigation that Ruttley discovered E&E subcontracted out the milling work on the tool body to Bilco to be performed on their computer-controlled milling machine. Michael Borne, in sales at E&E Machine, testified that E&E hired Bilco to mill the slots on the tool body. Borne admitted he signed a confidentiality agreement with Deltide and did not inform them he was subcontracting part of the job. Borne testified that he provided only one drawing to Bilco and shielded all company information per his confidentiality agreement. Borne did not inform Bilco of the type of tool or customer for whom it was being built; Bilco cut and lathed slots on the outside diameter of a piece of bored pipe. Once cut, the cylinder was returned to E&E Machine Shop with the drawing, and E&E completed the tool. Plaintiff did not prove by a preponderance of the evidence that more than one drawing was in Bilco's possession or that Bilco knew what the tool was or who it was for when it milled the slots. In addition, plaintiff did not prove that Bilco kept any copy of the drawing in its computer-controlled milling machine.

Plaintiff also alleged Bilco had a Mag Trap in its possession on multiple occasions. Plaintiff provided invoices documenting rentals to Shell or Tetra, and deliveries of the Mag Trap to Bilco. Bilco was under a duty to take the tool out of the box and combine it, per customers' instructions, in the drill strings it assembled. The fact of Mag Trap deliveries to Bilco upon request by Shell or Tetra does not, without more, establish any impropriety on Bilco's part. The evidence supports that Bilco performed the services for which it was hired: combining multiple suppliers' tools (including some of its own) into drill strings for delivery to different job sites. Plaintiff offered no evidence to support the allegation that Bilco was familiar with the structure, specifications, and construction of the Mag Trap simply from observing the tools while they were in the Bilco shop.

The Court finds that Plaintiff failed to carry its burden to establish by a preponderance of the evidence that Defendants had full access to Plaintiff's drawings and specifications for the Mag Trap, or that Defendants otherwise improperly gained knowledge of the Mag Trap, thereby misappropriating Rattler's trade secrets when manufacturing the Tough Boy tool.

2) Plaintiff failed to prove that Bilco employees disassembled the Mag Trap in the Bilco facility. At trial, Steven Moody, an employee of Deltide, testified that Deltide rented the Mag Trap tool to Shell under contract. The Mag Trap was shipped to Bilco to be assembled with other tools into a drill string and shipped to the Shell job site. Tools were shipped to Bilco pursuant to Shell's verbal orders. Traditionally, after each run the drill strings were shipped back to Bilco and then the Mag Trap was returned to Deltide for redressing to prepare it for the next rental. Redressing is a procedure where tools are taken apart and cleaned up between jobs: they are inspected for damage, the magnets are taken out, the sleeve is removed, the tool

body is pressure-washed and repainted, and the magnets are replaced, if damaged, or reinserted, if not damaged.

Moody testified that on one occasion he was sent by David Ruttley to the Bilco shop to redress a Mag Trap since there was not enough time to ship it back to Deltide, there being only 17 days between rentals. Moody saw the Mag Trap on a pallet or inside a box, and noticed that one magnet (possibly two) had been removed from its recessed area.[149]  The Mag Trap contains approximately 21 magnets. Moody met with Ruttley afterward to tell him about the incident, as it was an odd occurrence. Moody testified this was his first visit to Bilco and he was never in the Bilco office. He admitted he never saw a Rattler magnet in the hands of a Bilco employee,[150] never saw a Bilco employee undo a magnet from the tool, did not see any tools nearby indicating a Bilco employee removed the magnet, and had no personal knowledge the magnet had been removed at Bilco. He conceded the magnet could have been removed by someone else at another location. Moody did not see William Coyle and did not witness any Bilco employee measuring or taking photographs of the tool. No Bilco employee asked questions regarding the dimensions, sources, design, or technical specifications of the Mag Trap. Moody could not verify that the Rattler patent numbers were stamped on the tool. Finally, Moody stated there was nothing else unusual about that tool.

The Court finds that Plaintiff has failed to carry its burden to establish by a preponderance of the evidence that any Bilco employee disassembled a Rattler Mag Trap as an aid in copying the Rattler tool design.

---

[149] Moody testified it was common for magnets to be beaten up, or to contain nicks or scars after a run, but not for them to be completely off the tool.

[150] The Court notes that Moody testified that at one point he personally handed a Rattler magnet to a Bilco employee when he was at the Bilco shop and they played with it.

3) Plaintiffs failed to establish that Bilco was a customer or a distributor of Rattler or had a contractual relationship with Rattler. Steven Moody testified that the tools were rented to Shell, and were shipped to Bilco only for assembly with various other tools into a drill string for shipment to Shell's worksite. At trial, David Ruttley, Vice President and Operations Manager for Deltide, President of Rattler, and inventor of the Mag Trap, testified that Rattler had no rental agreement with Bilco, but instead rented the Mag Trap to Shell and Tetra. Bilco was neither a customer, nor a distributor, of Rattler. Rather, customers Shell and Tetra gave verbal instructions to ship the Mag Traps they rented to the Bilco facility for assembly into drill strings in combination with other companies' equipment. No contract between Rattler and Bilco was introduced into evidence.

The Court finds that since no contract existed between Rattler and Bilco, Bilco was neither a customer nor a distributor for Rattler, and no proof of a violation of good faith and fair dealing was provided, the Plaintiff has failed to carry its burden to establish by a preponderance of the evidence that Bilco breached any contractual duties of good faith and fair dealing.

4) Plaintiffs failed to establish that Defendants violated Louisiana's trade secrets or unfair practices law. Under the Louisiana Uniform Trade Secrets Act (LUTSA), La. R.S. 51:1431-39, a Plaintiff may recover damages for the actual loss caused by the misappropriation of a trade secret if the Plaintiff proves "(a) the existence of a trade secret, *Pontchartrain Med. Labs. Inc. v. Roche Biomedical Labs. Inc*, 677 So.2d 1086, 1090 (La.Ct.App. 1st Cir. 1996); *Engineered Mechanical Serv., Inc.  v. Langlois*, 464 So.2d 329, 333 (La.Ct.App. 1st Cir. 1984), (b) a misappropriation  of the trade secret by another, and (c) the actual loss caused by the misappropriation. La. R.S. 51:14321, 1433."[151]

---

[151] *Reingold v. Swiftships, Inc*. 126 F.3d 645, C.A.5 (La. 1995).

In Louisiana, a "trade secret" is defined, in pertinent part, as "information, including a formula, pattern… that: (a) derives independent economic value, actual or potential, from not being generally known to and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use, and (b) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.[152]  In Louisiana, a "misappropriation" is defined, in pertinent part, as the "(a) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or (b) disclosure or use of a trade secret of another without express or implied consent by a person who: (i) used improper means to acquire knowledge of the trade secret; or… (iii) before a material change of his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.[153]

Here Plaintiff established that its drawings and specifications were trade secrets since they were not generally known and could have provided economic value if disclosed and used by another, and because Rattler made reasonable efforts to maintain their secrecy. Plaintiff established the drawings and specifications were provided to E&E Machine Shop pursuant to an agreement to build two Mag Trap tools for Rattler. Michael Borne, E&E's employee, signed a confidentially agreement, and admitted he did not get Rattler's consent before subcontracting the milling job to Bilco. However, Borne testified that subcontracting millwork was common procedure in the industry, and E&E complied with all confidentiality requirements by blocking out Rattler's name, and not divulging the name, nature, or purpose of the tool. In addition, E&E provided only one drawing to Bilco so that it could mill the recesses in the bored pipe, watched

---

[152] LSA-R.S. 51:1431, (4).
[153] LSA-R.S. 51:1431, (2).

the work being performed, and took back the drawing when the work was complete.[154] Plaintiff did not offer evidence to dispute this testimony.

Ruttley also testified that the Mag Trap uses proprietary magnets, designed by and supplied exclusively to Rattler, which also meet the definition of trade secrets, by virtue of the fact that the magnets are only available to Rattler. Plaintiff failed to establish that Bilco made any effort to improperly gain knowledge of Rattler's proprietary magnets for use in the Tough Boy tool. Each Mag Trap contains approximately 21 of the proprietary Rattle magnets. Thomas Ashy, a former employee of Bilco, who claimed that the Tough Boy tool was his conception, testified that Bilco uses approximately 192 inexpensive small circular magnets,[155] also called button magnets, which Bilco purchased in large quantities in order to make the tool cheaper as well as easier to service in the field.

Plaintiffs failed to establish that Bilco improperly gained knowledge of any Rattler trade secret, as Bilco merely performed a subcontracting milling job for E&E Machine, and was not shown to have attempted any misappropriating of trade secret information on Rattler's proprietary magnets. Plaintiffs failed to prove that Bilco had reason to know that the milling job it performed for E&E Machine involved a trade secret or that Bilco used any improper means to acquire knowledge of any Rattler trade secrets.

Since Plaintiffs failed to establish that Bilco misappropriated any Rattler trade secrets, the Court finds it unnecessary to discuss the issue of Plaintiff's alleged state claim damages or claims of Defendants' alleged unjust enrichment pursuant to LUTSA.

---

[154] The Court notes Bilco used a computer-controlled milling machine for this job, and could have retained the specification in their computer memory after the milling job was completed, but Plaintiff offered no evidence to substantiate this allegation, or to demonstrate this single drawing contained independent economic value.

[155] The larger Bilco tool contains approximately 240 button magnets.

The Louisiana Unfair Trade Practices Act (LUTPA) prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conducts of any trade or commerce."[156]   LUTPA creates a private cause of actual to recover actual damages suffered because of a defendant's unfair practices.[157]   LUTPA leaves determination of what constitutes an "'unfair or deceptive method, act or practice' largely to the courts to decide on a case-by-case basis."[158]   Louisiana courts have interpreted these terms variously to mean unethical or unscrupulous acts, or those offensive to public policy or substantially injurious to consumers.[159]   The courts have also found that LUTPA does not restrict "sound business practices, the exercise of permissible business, judgment, or appropriate free enterprise transactions."[160]

In addition, Louisiana "state trade secret law cannot bar reverse engineering or independent discovery,"[161]   although it would afford protection against any unauthorized use or disclosure if it were "gained by improper means."[162]   Here, Plaintiff has not established that

---

[156] *Reingold v. Swiftships, Inc*. 126 F.3d 645, 652, C.A.5 (La. 1995).

[157] LSA R.S. 51:1409. **Private actions**
A. Any person who suffers any ascertainable loss of money or movable property, corporeal or incorporeal, as a result of the use or employment by another person of an unfair or deceptive method, act, or practice declared unlawful by R.S. 51:1405, may bring an action individually but not in a representative capacity to recover actual damages. If the court finds the unfair or deceptive method, act, or practice was knowingly used, after being put on notice by the attorney general, the court shall award three times the actual damages sustained. In the event that damages are awarded under this Section, the court shall award to the person bringing such action reasonable attorney fees and costs. Upon a finding by the court that an action under this Section was groundless and brought in bad faith or for purposes of harassment, the court may award to the defendant reasonable attorney fees and costs…
C. Any permanent injunction, judgment or order of the court made under R.S. 51:1407 and R.S. 51:1408 shall be prima facie evidence in an action brought under R.S. 51:1409 that the respondent used or employed a method, act or practice declared unlawful by R.S. 51:1405 or by rule or regulation promulgated pursuant thereto; provided, however, that this subsection shall not apply to consent orders or voluntary assurances of compliance.
D. If any person is enjoined from the use of any method, act, or practice or enters into a voluntary compliance agreement accepted by the attorney general under the provisions of this Chapter, such person shall have a right of action to enjoin competing businesses engaged in like practices…
LSA-R.S. 51:1409.

[158] *Reingold v. Swiftships, Inc*. 126 F.3d 645, C.A.5 (La. 1995), citing *Marshall v. Citicorp Mortgage, Inc.,* 601 So.2d 669 (La.Ct.App. 5th Cir. 1992).

[159] *Id*. at 654.

[160] *Reingold v. Swiftships, Inc*. 126 F.3d 645, C.A.5 (La. 1995), citing *Turner v. Purina Mills, Inc*. 989 F.2d 1419, 1422 (5th Circ. 1993).

[161] *Reingold v. Swiftships, Inc*. 126 F.3d 645, 652, C.A.5 (La. 1995).

[162] *Id*.

Bilco either reverse-engineered the Mag Trap to copy it when designing the Tough Boy or improperly acquired or used Rattler trade secrets, as discussed above.

Plaintiff alleges Defendants violated LUTPA, but offered no evidence at trial to show unfair or deceptive methods, acts or practices by Bilco. David Ruttley testified that Rattler only rents its Mag Trap tool, whereas Bilco both sold and rented its Tough Boy tool. Ruttley testified that Bilco sold the Tough Boy for a "ridiculous amount of money,"[163] which took money away from Rattler's rental business, and thereby motivated Rattler to initiate this lawsuit. Selling tools, Ruttley testified, is bad business because upon a sale the tool becomes the property of the purchaser. The manufacturer loses control, and cannot maintain the tool up to its proper standards. The manufacturer's reputation could be endangered if a new owner fails to maintain it. Ruttley testified that if companies purchase tools, maintain them cheaply and rent them at high rates, then that could create a bad reputation for all magnetic retrieval tools.

Plaintiff has not produced evidence that Bilco committed any unethical or unscrupulous acts, or that its Tough Boy tool substantially injures the public. The Defendants assert that the Tough Boy is an effective, less-expensive magnetic retrieval tool that is easily serviced in the field, and that Bilco is willing to sell it, particularly to foreign customers, or to rent it. Mr. Ashy testified at length about his design process, experimentation and building the Bilco tool. Rattler offered no evidence to dispute Mr. Ashy's testimony that he was the originator of the concept for the Bilco tool, and designed and supervised the building and testing of it, with the exception of the concept for the dovetailed slots for which he took no credit. Mr. Ashy's original concept for the Bilco tool was to design a tool for mass production that could be produced inexpensively, sold with ease of replacement parts so new owners, in particular overseas operators, were not restricted to renting tools they would prefer to purchase. The ability to sell tools while allowing

---

[163] Trial transcript, day one, p. 56.

56

for proper maintenance by new owners, who need only purchase inexpensive replacement button magnets in quantity, thereby allowing for full ownership of the tool without a licensing agreement between seller and buyer was an established goal of Mr Ashy when designing the Bilco tool. Rattler Tools, in the tool rental business, may be unhappy with Bilco's business operations, as they compete with the Mag Trap, but providing an alternative, in the absence of any unauthorized use or disclosure of a trade secret, is an exercise of free trade that does not entitle Plaintiff to the relief it seeks.

## PART FOUR: DEFENDANT'S COUNTER CLAIM AGAINST PLAINTIFF

The Defendants alleged in counterclaims that the Rattler patents contain defective titles, were invalid, and that Bilco did not infringe on the Rattler patents. In addition, they alleged Rattler disseminated untruthful information concerning Bilco's Tough Boy tool to hurt Bilco's reputation and disrupt Bilco's business practices, in violation of LUTPA, thereby engaging in "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."[164] As discussed earlier, LUTPA leaves determination of what constitutes an "'unfair or deceptive method, act or practice' largely to the courts to decide on a case-by-case basis."[165]  Louisiana courts have interpreted these terms to mean unethical or unscrupulous acts, or acts offensive to public policy or substantially injurious to consumers.[166]  The courts have also found that LUTPA does not restrict "the exercise of permissible business..."[167]

---

[164] Louisiana Unfair Trade Practices Act, La. R.S.A. § 51:1405 (West 2002).
[165] *Reingold v. Swiftships, Inc.* 126 F.3d 645, C.A.5 (La. 1995), citing *Marshall v. Citicorp Mortgage, Inc.,* 601 So.2d 669 (La.Ct.App. 5th Cir. 1992).
[166] *Id.* at 654.
[167] *Reingold v. Swiftships, Inc.* 126 F.3d 645, C.A.5 (La. 1995), citing *Turner v. Purina Mills, Inc.* 989 F.2d 1419, 1422 (5th Circ. 1993).

Defendants waived their right to allege invalidity of the Rattler patents before trial. Although Defendants argued that waiver was a mistake on their part, the issue is moot as the Court has found no infringement by Bilco of the Rattler patents.

In their counterclaim of damages for the dissemination of untruthful information on Bilco's tool, Defendants relied on the testimony of Kevin Pollard, vice president of international marketing and business development for Rattler on an independent contractor basis, through a company he owns called Global Solve. Mr. Pollard testified that he wrote the April 17, 2005 letter to Tetra advising them of Rattler's complaint that Bilco was infringing on Rattler patents and warning Tetra they could be culpable as well, as contributory infringers. The letter was written in collaboration with Rattler principals, and Mr. Pollard signed it. The primary purpose of the letter, he testified, was to advise Tetra of the lawsuit and that Tetra could be a potentially contributing infringer if they continued to do business with Bilco and Rattler won its infringement litigation. Defendants also established that Mr. Pollard did not go outside of any law firm representing Rattler to get an independent opinion on whether the Bilco tool likely infringed on any of the Rattler patents. However, this alone is insufficient to establish that Rattler attempted to damage Bilco's reputation and interfere with its business practice.

As Kenneth Boudreaux, Rattler's expert on its alleged financial damages, testified, Tetra stopped renting Rattler's magnetic retrieval tool when Bilco developed their Tough Boy tool. After Mr. Pollard wrote the letter to Tetra informing them of their allegations of patent infringement, Tetra subsequently stopped doing business with Bilco. However, Mr. Boudreaux provided convincing testimony that the financial trouble Bilco was experiencing was a plausible alternative reason for Tetra distancing from Bilco. In addition, Tetra has not resumed doing business with Rattler, so it has derived no economic benefit from the letter to Tetra.

George Panzeca, a CPA and expert in accounting and finance as well as damage qualifications, and Bilco's expert on its alleged financial damages, testified that Tetra represented a significant and growing part of Bilco's business and there was a dramatic decline in 2005, ending up in zero business by 2006. Defendants failed to establish by a preponderance of the evidence that the business fall-off was directly a result of the Rattler letter and not Bilco's precarious financial position. Although Mr. Pollard admitted he did not go outside of any law firm representing Rattler to get an independent opinion on whether the Bilco tool likely infringed on any of the Rattler patents, the Defendant offered insufficient evidence so support any allegation that the opinion Mr. Pollard received was either offered or used with any bad faith intention. There is no evidence to support that Rattler did anything other than engage in the sound business practice of protecting, in good faith, patents that it believed were being infringed upon. The Court finds that Defendant has failed to establish that Rattler engaged in unethical or unscrupulous acts, acts offensive to public policy, or acts substantially injurious to consumers, in its prosecution of the instant litigation.

In its penultimate finding, the Court notes that as a result of this opinion and order, the stipulated agreement wherein Bilco Tools agreed not to use or sell a magnetic retrieval tool until the resolution of the instant litigation and the Court's final decision hereby is declared MOOT, as the Court finds no patent infringement on the part of Bilco Tools.

Finally, as discussed earlier, the Court will only find a case exceptional under 35 U.S.C. § 285 when the party seeking the award of attorney fees produces sufficient evidence of bad faith. That party must prove bad faith by clear and convincing evidence. Based on testimony at trial, the Court finds this is not an exceptional case, as Defendants have not proved bad faith on the part of Rattler Tools by clear and convincing evidence. Consequently, the Court declines to award attorney fees in this action.

**CONCLUSION**

Having considered the complaint, record, trial testimony and applicable law, the Court has determined Plaintiff failed to establish grounds for relief for alleged patent infringement and for alleged willful patent infringement, by a preponderance of the evidence as required by law. Further, the Court has determined Plaintiff failed to establish grounds for relief for its Louisiana state law claims by a preponderance of the evidence, as required by law.  Finally, the Court has determined Defendants established grounds for relief regarding their counterclaim of non-infringement by the Bilco tool on Rattler patents, but failed to establish grounds for relief regarding their claim of damages allegedly caused by Rattler's dissemination of information about the instant litigation, by a preponderance of the evidence, as required by law. Accordingly, **IT IS ORDERED** that Plaintiff's petition is **DISMISSED WITH PREJUDICE**.  It is further ordered that Defendants' counterclaim is **GRANTED IN PART** and **DENIED IN PART**. Judgment will be entered accordingly.

New Orleans, Louisiana this 6th day of July, 2007.

_____

HELEN G. BERRIGAN
U.S DISTRICT JUDGE